**In re INVESTIGATION BEFORE the APRIL 1975 GRAND JURY.**

**Misc. No. 75–193.**

United States District Court,
District of Columbia.

Nov. 13, 1975.

Earl J. Silbert, U. S. Atty., Carl S. Rauh, Principal Asst. U. S. Atty., Brian W. Shaughnessy, Robert R. Chapman, Asst. U. S. Attys., Washington, D. C., for the United States.

Sol Z. Rosen, Washington, D. C.

## MEMORANDUM AND ORDER

WILLIAM B. JONES, Chief Judge.

The motion presently before this Court presents an issue which to this Court's knowledge has not been decided by any federal court. The government has moved for an order requiring certain witnesses appearing before a grand jury to have separate counsel.

### I. FACTS

At midnight on September 30, 1975, Local 6 of the Newspaper and Graphics Communications Union, which represents pressmen working at the Washington Post Company, went on strike against the Post. During the early morning hours of October 1, 1975, serious and substantial damage, now estimated in excess of one million dollars, was inflicted on the press machinery at the Post, and the foreman of the pressroom was beaten. It appears that there were over one hundred pressmen of Local 6 in the pressroom at the time the

damage was sustained. Government's Motion at 2.

On October 6, 1975, a federal grand jury commenced an investigation into the October 1 occurrences at the Post. The law firm of Barr and Peer, which represents Local 6, retained the services of Sol Z. Rosen, Esquire, for the purpose of representing the members of Local 6 in criminal matters arising out of the October 1 occurrences. Transcript at 3.[1]

Mr. Rosen represents himself to be "counsel for the witnesses." Opposition to Government's Motion at 1. At oral argument, he further stated that at a general meeting of the pressmen, he advised them as a group of their rights vis-a-vis the grand jury investigation and of the nature of the investigation. Transcript at 3–4. He did not encourage them to talk to or remain silent before the grand jury. Transcript at 3–4. He did inform them of the possibility that each pressman present during the October 1 occurrences could be found guilty as conspirators, regardless of any actual participation. Transcript at 5. He also distributed xerox copies of instructions to each member regarding invocation of the privilege against self-incrimination. Transcript at 5. The only indication given by Mr. Rosen to the pressmen that a grant of immunity was possible was a "caveat" found on the xerox sheet which informed then that they need not testify "unless given complete or transactional immunity." Mr. Rosen then instructed them that if granted immunity, they should "obey the law." Transcript at 5. Mr. Rosen stated that his main role as counsel was to advise the union witnesses of their legal rights as the investigation progressed. For ethical reasons, he did not interview the witnesses personally (Transcript at 4), which would have allowed him to determine each witness' knowledge, possible criminal liability, or possible chances for a grant of immunity from the government. In sum, Mr. Rosen did not provide the witnesses with the detailed, informed, substantive advice they otherwise would have received.

The Grand Jury subpoenaed twenty-one members of Local 6 who were working in the pressroom during the morning hours of October 1. Of the twenty-one, all but two invoked the Fifth Amendment privilege against self-incrimination when questioned about the events at the Post. Government's Motion at 2. According to the United States Attorney, many of the witnesses asserted the privilege when questioned about their age, marital status, number of children, name of parents, and relationship with their attorney. Government's Motion at 2. Many read from the xerox sheet of paper which had been distributed by Mr. Rosen. The two witnesses who testified without invoking the Fifth Amendment stated that they had not seen anything. Government's Motion at 2–3.

## II. MERITS

■ As both the government and Mr. Rosen admit, the government cannot fruitfully investigate the occurrences at the Post while the subpoenaed witnesses as a group continue to invoke the privilege against self-incrimination in response to all questions of the grand jury. Nor can the government determine which witnesses should be granted immunity from prosecution while all witnesses refuse to give any indication of the extent of their participation—if any—in the October 1 occurrences. The "stonewall" which has been erected can at least partially be attributed to the multiple representation of the witnesses by Mr. Rosen. Certainly none of the witnesses could be compelled, in the absence of a grant of immunity pursuant to 18 U.S.C. § 6001 et seq., to provide the grand jury with self-incriminatory information. A further impediment to the functioning of the grand jury, however, has been erected by Mr. Rosen's

---

[1]. All references to Transcript are to the excerpted portions of the November 7, 1975 hearing on the Government's motion, filed November 10, 1975.

multiple representation of all the witnesses.

As noted earlier, Mr. Rosen has correctly stated that he cannot speak individually to each of his clients about that client's knowledge of or role in the occurrences at the Post. This situation has led to two untoward results. First, Mr. Rosen cannot ethically advise one witness as to his best course of action, because inevitably such advice would injure another of his clients. For example, Mr. Rosen could not advise witness A, a marginal participant, to testify in exchange for a grant of immunity, that witness B directed the sabotaging of the Post presses. Thus, none of the witnesses has any idea as to his best course of action and as a result, none has approached the prosecutor to discuss a possible grant of immunity. For Mr. Rosen to state that the government has shown no prejudice from its inability to discuss possible immunity (Transcript at 9–10) begs the question. Since they have not received the advice they otherwise would receive, such failure is understandable if not expected. Second, the inability of Mr. Rosen to discuss each witness' situation individually has led to an unnecessary and uninformed categorical invocation of the privilege against self-incrimination by each pressman, regardless of whether the privilege is applicable. With proper representation, each witness could knowledgeably answer certain non-incriminatory questions which would either lead the prosecutor to evidence incriminatory of other pressmen, or permit the prosecutor to assess whether the responding witness should be granted immunity.

The necessarily inadequate representation offered by Mr. Rosen, therefore, has stifled the grand jury investigation by leaving both the witnesses and the prosecutor incapable of determining their most favorable courses of action. Separate representation, on the other hand, would ensure that each of the witnesses could make a fully-informed and intelligent assessment about whether to cooperate with the prosecutor, and that the prosecutor could intelligently determine which witnesses should be encouraged to cooperate through offers of grants of immunity. The Grand Jury, to be sure, would remain subject to the traditional restraints on its powers, but it would nonetheless begin to function normally.

Furthermore, Mr. Rosen's position must inevitably lead to a breach of the secrecy of the grand jury proceedings. If one witness informs Mr. Rosen of the substance of his testimony before the grand jury, Mr. Rosen ethically would be compelled to inform other clients of that testimony if detrimental to them. Moreover, a civil suit brought by the Washington Post Company against the union, which retains Mr. Rosen, seeks fifteen million dollars in damages resulting from the October 1 occurrences. Although Mr. Rosen is not now retained by the union to represent it in this civil action, he could not state unequivocally to the Court that he would not be obliged to disclose to the union the substance of the grand jury proceedings as related to him by his individual clients. Transcript at 2. Thus, not only has the very functioning of the grand jury been impaired, but also its integrity as a confidential investigative body would be threatened if not compromised by continued multiple representation.

To require separate counsel for each witness, however, necessarily infringes upon that witness' right to counsel of his choice. In determining whether such an infringement is justified, this Court must analyze and weigh the opposing interests involved. On the one hand, each witness has the right to retain counsel of his choice and the right to associate for purposes of retaining counsel. Counterbalancing these two rights is the public's interest in the effective functioning of the grand jury.[2]

2. The public interest in the effective and ethical assistance of counsel is not relevant at this stage of the proceedings. It is clear that a person may intelligently, knowingly and voluntarily waive his right to effective assistance of counsel. *See United States v.*

In balancing these respective interests, the Court is of the opinion that the public interest in the effective functioning of the grand jury compels the conclusion that neither Mr. Rosen nor any other single attorney can continue to represent all pressmen called as witnesses before the grand jury.

### A. The Interests of the Witnesses

■ In *Faretta v. California*, 422 U. S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Supreme Court recently expounded on the relationship between lawyer and client. The Court made clear that "[T]he right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." 95 S.Ct. at 2533. The accused must be "master" of his defense, and counsel his "assistant." *Id.* It follows that a person should be able to choose his own counsel; if the state were to dictate which counsel each accused must retain, he would no longer be "master" of his defense. *See Chandler v. Fretag*, 348 U.S. 3, 9, 75 S.Ct. 1, 99 L.Ed. 1 (1954); *Lee v. United States* 98 U.S.App.D.C. 272, 274, 235 F.2d 219, 221 (1956); *United States v. Liddy*, 348 F.Supp. 198, 200 (D.D.C.1972).

■ The right to free choice of counsel, however, is not absolute. For example, an indigent defendant in a criminal trial has the right to the effective assistance of counsel; he does not have the right to appointed counsel of his choice. *See United States v. Richmond*, 197 F.Supp. 125, 126 (D.Conn. 1960), *rev'd on other grounds*, 295 F.2d 83 (2d Cir. 1961); *cf. Reickauer v. Cunningham*, 299 F.2d 170, 172–73 (4th Cir. 1962). And even where a defendant can afford counsel of his own choice, "that goal must be weighed and balanced against an equally desirable public need for the efficient and effective administration of criminal justice." *United States ex rel. Carey v. Rundle*, 409 F.2d

1210, 1214 (3d Cir. 1969). Thus, the constitutional mandate that a defendant be afforded assistance of counsel of choice "is satisfied so long as the accused is afforded *a fair or reasonable opportunity* to obtain particular counsel." *Id.* at 1215 (emphasis added). In short, "there is no absolute right to a particular counsel." *Id.*

■ The witnesses' fundamental right to associate for purposes of retaining legal representation has of course, long been recognized. *See NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L. Ed.2d 405 (1963); *Brotherhood of Railway Trainmen v. Virginia*, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964); *United Mine Workers v. Illinois State Bar Association*, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); *United Transportation Union v. State Bar of Michigan*, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971). This right, however, can also be legitimately impaired by the state if it shows a "substantial regulatory interest, in the form of substantive evils flowing from the petitioner's activities, which can justify" prohibition of those activities. *NAACP v. Button, supra,* 371 U.S. at 444, 83 S. Ct. at 344. If the state regulation is based upon compelling need, and is narrowly tailored to eliminate the substantive evil which is its target, then it is constitutionally sound. *See NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

### B. The Interests of the Government

Balanced against these interests of the witnesses is the public interest in the effective functioning of the grand jury. The critically important role of the grand jury in insuring fair and effective law enforcement is best described by the Supreme Court in *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Quoting substantially from its earlier opinion in

*Garcia*, Crim.Nos. 74–3527, 74–3718, 517 F. 2d 272 (5th Cir. 1975); *cf. Campbell v. United States*, 122 U.S.App.D.C. 143, 145,

352 F.2d 359, 361 (1965). In light of this Court's decision, the presence or absence of such waiver need not be determined.

*Branzburg v. Hayes,* 408 U.S. 665, 92 S. Ct. 2646, 33 L.Ed.2d 626 (1972), the Court stated,

> "[T]he investigation of crime by the grand jury implements a fundamental governmental role of securing the safety of the person and property of the citizen . . . ." 408 U.S., at 700, 92 S.Ct. [2646] at 2666. "The role of the grand jury as an important instrument of effective law enforcement necessarily includes an investigatory function with respect to determining whether a crime has been committed and who committed it. . . 'When the grand jury is performing its investigatory function into a general problem area . . . society's interest is best served by a thorough and extensive investigation.' *Wood v. Georgia,* 370 U.S. 375, 392 [82 S.Ct. 1364, 1374, 8 L.Ed.2d 569] (1962). A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.' *United States v. Stone,* 429 F.2d 138, 140 (C.A. 2, 1970). Such an investigation may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors. *Costello v. United States,* supra, 350 U.S. [359] at 362 [76 S.Ct. 406, at 408, 100 L.Ed. 397]. It is only after the grand jury has examined the evidence that a determination of whether the proceeding will result in an indictment can be made . . ." Id., at 701–702, 92 S.Ct. [2646] at 2666.

414 U.S. at 344, 94 S.Ct. at 618. Further, the Court noted that "the duty to testify has been regarded as 'so necessary to the administration of justice' that the witness' personal interest in privacy must yield to the *public's overriding interest in full disclosure.*" 414 U.S. at 345, 94 S.Ct. at 618 (emphasis added). *See also United States v. Dionisio,* 410 U.S. 1, 9–10, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). Manifestly, the grand jury is not merely a protective instrument guarding against abusive indictments rendered by irresponsible prosecutors. It is an integral part of our criminal justice system, providing the public with a fair and effective method of investigating wrongdoing.

### C. Balancing the Interests

In the only reported decision dealing precisely with this issue, the Supreme Court of Pennsylvania in a well-reasoned opinion held that separate counsel were required. In *Pirillo v. Takiff,* 341 A.2d 896 (Pa.1975), appeal docketed, No. 75–525, 44 U.S.L.W. 3230 (Oct. 6, 1975), an attorney and his associate jointly represented twelve policemen before a special grand jury investigating police corruption in Philadelphia. The lower court disqualified the two attorneys from representing the twelve policemen subpoenaed to testify before the grand jury. He found, *inter alia,* that

> with one attorney representing all witnesses in a particular area of investigation, the Special Prosecutor could not convince counsel to elicit cooperation of one witness since such cooperation might seriously implicate the attorneys' other clients in illegal activity. 341 A.2d at 899.

He concluded that

> the practical effect of the multiple representation was the creation of the conspiratorial 'stonewall' to the investigation shrouded by the interwoven attorney-client relationships. 341 A. 2d at 899.

The Pennsylvania Supreme Court upheld the lower court's order, stating:

> We have earlier pointed out that each right asserted by petitioners is susceptible of curtailment. We have also endeavored to demonstrate that the state interests are sufficiently strong to justify some incursion upon the rights invoked by petitioners. The court in its supervisory capacity over the grand jury must be alert to pre-

vent as far as possible any abridgment of that body's function which is to investigate public wrongs and to bring indictments for the protection of society. 341 A.2d at 905.

The Court concluded:

> In short, the degree of infringement resulting from the supervising judge's order is the minimum necessary to insure the state interests while at the same time the infringement is justified by the scope of the state interests and the extent of harm which is sought to be prevented. 341 A.2d at 906.

 This Court feels compelled to reach the same conclusion. Mr. Rosen's multiple representation of the pressmen has caused a stifling of the grand jury investigation. The witnesses, based upon insubstantial advice from counsel, have refused to cooperate; the prosecutors, because of the pressmen's blanket, unadvised claims of the privilege against self-incrimination, cannot intelligently determine which pressmen should be granted immunity in order to further the investigation.

To disqualify Mr. Rosen or any other single individual from representing all the pressmen would only slightly impair the rights of the pressmen. Such an order would not impose counsel upon the pressmen, as was the case in *Faretta v. California, supra,* for each pressman retains the right to choose from a limitless pool of qualified attorneys in the District of Columbia. Thus, each pressman will be afforded the effective assistance of counsel, while the grand jury will be able once again to function normally. Removing only one attorney from the otherwise free choice of counsel available to each pressman affords each "a fair or reasonable opportunity" to obtain counsel of choice. *United States ex rel. Carey v. Rundle, supra* at 1215. And such a slight infringement must bow to "the public's overriding interest in full disclosure" of the events of October 1.

*United States v. Calandra, supra,* 414 U.S. at 344, 94 S.Ct. 613.

Nor can the impairment of the pressmen's right to associate be found constitutionally infirm. It is only for this single criminal proceeding that the pressmen are unable jointly to retain counsel. Such an infringement falls far short of the broad prohibition of activity condemned in *Button* and its progeny. As the Supreme Court of Pennsylvania observed in *Pirillo:*

> The order, however, pertains only to the conduct of the grand jury investigation. Recourse to F.O.P. [Fraternal Order of Policemen] lawyers in other legal matters is not restricted. There is no deterrence or chilling effect on the political expression of the F.O.P. and no smothering of discussion of common interests to its members or disruption of F.O.P. efforts to initiate and defend legal matters or to provide legal service to its members save in this single proceeding. 341 A.2d at 906.

By citing the Court to several cases which permit codefendants in a criminal trial to retain counsel even though a conflict of interest exists, Mr. Rosen fails to address the peculiar situation present here. In those cases dealing with several defendants' waiver of their right to assistance of counsel free of conflicting interests, the interest of the government in the effective functioning of the criminal justice system was not in issue. In *Campbell v. United States,* 122 U.S.App.D.C. 143, 352 F.2d 359 (1965); *Lollar v. United States,* 126 U.S.App.D. C. 200, 376 F.2d 243 (1967), and *United States v. Garcia,* Crim. Nos. 74–3527, 74–3718, 517 F.2d 272 (5th Cir. 1975), the courts were only presented with the right of defendants in criminal trial to the effective assistance of counsel. In none of these cases did the government argue that the criminal processes were stifled by the defendants' refusal to accept separate counsel. Thus, *Campbell,*

*Lollar,* and *Garcia* are not controlling here.[3]

In sum, requiring the pressmen to obtain separate counsel—if they wish to retain counsel at all—constitutes a minimal and temporary impairment of their constitutional rights. Moreover, such an order would permit the grand jury, now at a standstill, to proceed with its investigation with full force and with no fear of compromising the secrecy of its proceedings.

In light of the foregoing, it is this 13th day of November, 1975,

Ordered, that Sol Z. Rosen, Esquire, is disqualified from representing more than one of the members of Local 6 in proceedings before the April 1975 grand jury investigation into the October 1, 1975 occurrences at the Washington Post Company, and it is

Further ordered, that in the event any member of Local 6 subpoenaed to testify before the April 1975 grand jury investigating the October 1, 1975 occurrences at the Washington Post Company wishes to be represented by counsel, he or she must retain separate counsel not retained by any other subpoenaed member in the same matter.

---

3. Even if relevant, post grand jury cases are by no means uniform in always permitting multiple representation if defendants make a valid waiver. In *U. S. ex rel. Hart v. Davenport,* 478 F.2d 203 (3d Cir. 1973), the Third Circuit noted the danger to the public interest in law enforcement inherent in multiple representation:

It is inherently wrong to represent both the employer and the employee if the employee's interest may, and the public interest will, be advanced by the employee's disclosure of his employer's criminal conduct. 478 F.2d at 209.

In light of the fact that the only persons in the pressroom at the critical times on October 1 were the pressmen, *Davenport's* warning is particularly applicable here.