**In re Matter of Seymour A. GOPMAN.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Seymour A. GOPMAN,
Defendant-Appellant.**

No. 75–1560.

United States Court of Appeals,
Fifth Circuit.

May 6, 1976.

William T. Coleman, Jr., North Miami Beach, Fla., Michael J. Osman, Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Miami, Fla., Martin L. Steinberg, U. S. Sp. Atty., U. S. Dept. of Justice, Miami, Fla., Robert H. Plaxico, Dept. of Justice, Criminal Div., Washington, D.C., for plaintiff-appellee.

Before MORGAN, CLARK and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge.

The issue in this appeal is whether the trial judge erred when he disqualified Seymour A. Gopman, Esq., from simultaneously representing certain labor unions and three officials of these unions who had appeared as witnesses before a grand jury. We find no error, and affirm the order of disqualification entered below.

## I.

This case arose in the context of a federal grand jury investigation of union activities in the Miami, Florida area. The general emphasis of this investigation was upon possible violations of the Labor-Management Reporting and Disclosure Act (Landrum-Griffin Act), 29 U.S.C. § 401 et seq. At the time of the events which led to Gopman's disqualification, the grand jury was considering evidence of alleged embezzlement by union officials, alleged failures by union officials to maintain required records, and the alleged destruction of union records by such officials.[1] There was at that time only one announced "target" of the grand jury investigation. In connection with their probe of the "target" official, the grand jury issued subpoenas to three other union officers ordering them to bring certain records for examination. The three prospective witnesses consulted Gopman, who was their unions' retained counsel, concerning what response should be made to the subpoenas.

It was the practice of Gopman's firm to cease advising union officials once they had become "targets" of a grand jury investigation. In fact, the firm had represented the "target" official himself in the past, but had instructed him to retain separate counsel once he was named as a "target". However, since these three officers were not "targets", Gopman concluded that he could properly advise them as to their appearance before the grand jury. After studying the case, Gopman realized that the officials could be subject to criminal penalties under 29 U.S.C. § 439 if they had not maintained the records sought by the grand jury or if they had maintained these records improperly.[2] After being advised by Gopman of these possibilities, and of their right against self-incrimination, all three witnesses elected to invoke the Fifth Amendment before the grand jury; they refused to produce the records or to answer any questions concern-

---

1. Criminal penalties for embezzlement are provided by 29 U.S.C. § 501(c). Subchapter III of the Act, 29 U.S.C. §§ 431–41, establishes extensive reporting requirements for employers, unions, union officials and union employees. Willful violation of Subchapter III is a criminal offense under 29 U.S.C. § 439.

2. The nature of these witnesses' dilemma was graphically set forth in a colloquy between Gopman and the Honorable Joe Eaton, United

ing them. The government then contended that Gopman's dual representation of the unions and the individual witnesses was creating a conflict of interest. A motion for disqualification was filed December 13, 1974, and was granted by the court on January 7, 1975. After a dispute arose over the scope of the Court's order, an amended order of disqualification was filed February 6, 1975. The trial judge ordered Gopman to cease representing the three union officials before the grand jury, and to instruct the witnesses that they should obtain new counsel. Gopman's appeal followed.

## II.

 It is argued that the government lacked standing to challenge the alleged conflict of interest, and that the trial judge

had no jurisdiction to entertain the government's motion for disqualification. We reject these contentions. The substance of the government's motion was that appellant had violated the ethical canons of the American Bar Association, which prohibit a lawyer from representing parties with adverse interests.[3] These ethical canons had been explicitly adopted by the local rules of the district court in which this action arose.[4] When an attorney discovers a possible ethical violation concerning a matter before a court, he is not only authorized but is in fact obligated to bring the problem to that court's attention. See *Estates Theatres, Inc. v. Columbia Pictures Industries, Inc.,* 345 F.Supp. 93, 98 (S.D.N.Y.1972). Nor is there any reason why this duty should not operate when, as in the present case, a

---

States District Judge, who heard the government's motion to enforce the grand jury subpoenas and to have the three union officials held in contempt.

. . . . .

THE COURT:

. . . . .

So, we shall proceed for the moment to have you *tell us why these gentlemen do not* produce union records upon subpoena?
MR. GOPMAN:
Your Honor, under the Landrum-Griffin Act, stated earlier, each union is required to maintain certain records. They are required to keep the records, to maintain them and have them available, and if they fail to do so, they are violating the statute.
THE COURT:
They have done everything the statute says they are supposed to do—let us assume, they have kept them and they are available and the United States has subpoenaed them, how does their responsibility to keep records bar the exercise of a subpoena against the union for those records?
MR. GOPMAN:
Your Honor, we have not gotten to the point. I have already told Mr. Steinberg they do not have the records, they are not available. They just never had them.
Under the *Cursio* case, *Cursio versus United States [Curcio v. United States, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957)]*, they have the right to exercise their Fifth Amendment privileges and rights on these questions. They do not have to come in and say, I did not keep the records because then they can be convicted. They do not have to say I do not have the records because then they could be convicted.

They are not keeping the records, they do not have the duty to come in and say—They have the right to say, they do not have the duty to come in and answer the questions of where those records are because then they can be convicted.

. . . . .

Transcript of hearing held on December 10, 1974, at pages 18–19.

3. Especially pertinent is Canon 6 of the American Bar Association's Canons of Professional Ethics (entitled "Adverse Influences and Conflicting Interests"), which states in part:

It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.

See also American Bar Association, Code of Professional Responsibility, Canon 5 (entitled "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client"), especially Ethical Considerations 5–1 and 5–14 through 5–19.

4. See Local Rule 16E(4) of the United States District Court for the Southern District of Florida, which states:

The standards of professional conduct of members of the bar of this Court shall include the current Canons of Professional Ethics of the American Bar Association. For a violation of any of these canons in connection with any matter pending before this Court, an attorney may be subjected to appropriate disciplinary action.

lawyer is directing the court's attention to the conduct of opposing counsel. In fact, a lawyer's adversary will often be in the best position to discover unethical behavior. We also conclude that the trial judge had jurisdiction to act upon this claim of unethical conduct. Local rules whose validity is not challenged expressly incorporate the American Bar Association's ethical canons and expressly give the district court the power to fashion sanctions.[5] Furthermore, it is beyond dispute that lawyers are officers of the court and that the courts have the inherent authority to regulate their professional conduct. See *Ceramco, Inc. v. Lee Pharmaceuticals,* 510 F.2d 268, 270–71 (2d Cir. 1975); *Saier v. State Bar of Michigan,* 293 F.2d 756, 760 (6th Cir.), *cert. denied,* 368 U.S. 947, 82 S.Ct. 388, 7 L.Ed.2d 343 (1961). Appellant has failed to persuade us that different rules of standing and jurisdiction should apply when criminal proceedings are in the grand jury stage. A grand jury must exercise its powers under the authority and supervision of the court. See *United States v. Stevens,* 510 F.2d 1101, 1106 (5th Cir. 1975). We hold that, as an incident of this supervisory power, a court has jurisdiction to discipline an attorney whose unethical conduct relates to a grand jury proceeding within that court's control. From this conclusion, it naturally follows that an attorney's standing to report ethical problems to the appropriate court extends to the grand jury stage as well.

### III.

We are told that the order of disqualification exceeded the trial court's power to regulate the conduct of attorneys practicing before it. The proper standard for our review of a disqualification order is whether the trial judge abused his discretion. See *Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir. 1975). We also must remember that the court's discretion permits it "to nip any potential conflict of interest in the bud", *Tucker v. Shaw,* 378 F.2d 304, 307 (2d Cir. 1967). On the record before this Court, it is clear that the possibility of

a conflict had become great enough for the trial court to exercise its discretion. The grand jury was investigating possible breaches by union officials of certain fiduciary duties imposed by the Landrum-Griffin Act. As this Court has held, one chief purpose of the Act is to protect union members against possible overreaching by union officials. See *Smith v. Local No. 25, Sheet Metal Workers Int'l Ass'n.,* 500 F.2d 741, 750 (5th Cir. 1974). To further this purpose, Congress adopted several specific means, including the reporting requirements of the Act and the penalties for embezzlement. The former are designed to provide union members as well as the Department of Labor with the information necessary for them to scrutinize the affairs of labor organizations. See *Antal v. District 5, United Mine Workers of America,* 451 F.2d 1187, 1189 (3d Cir. 1971). The latter are intended to protect union members from financial corruption on the part of union officials and employees. See *United States v. Sullivan,* 498 F.2d 146, 150 (1st Cir.), *cert. denied,* 419 U.S. 993, 95 S.Ct. 303, 42 L.Ed.2d 265 (1974). Therefore, when possible violations of these statutes are under investigation, it is evident that the affected unions' interest will generally be in the fullest possible disclosure of pertinent records. Only if such disclosure is made can the unions be certain that possible problems affecting their rights under the Act are being thoroughly examined. For the same reason, in a normal case union counsel with his clients' interests at heart would tend to favor a complete disclosure of such records. The trial court concluded that appellant could not aggressively and diligently pursue this goal while advising the unions' own officials on whether to produce the records and what testimony, if any, to give regarding them. This conclusion seems entirely reasonable to us, and we find no abuse of discretion on these facts.

### IV.

In appellant's view, the district court's action was in retaliation for the

---

5. See note 4, *supra.*

three witnesses' use of the Fifth Amendment. We are urged to admonish the trial judge that it is improper to infer guilt from the assertion of Fifth Amendment rights. After the most careful scrutiny of the record in this case, we simply cannot accept appellant's characterization of the decision below. We would not hesitate to reverse if the trial judge had in fact (a) concluded, solely from the officers' invocation of the Fifth Amendment, that they had breached their fiduciary duties to the union, (b) held that the officers whose guilt had been thus established were in an adversary posture towards the unions which they were victimizing, and (c) disqualified appellant because he was representing both perpetrator and victim. It is well settled that no such inference of wrongdoing can be made from a witness' assertion of his rights under the Fifth Amendment. See *Grunewald v. United States*, 353 U.S. 391, 421–23, 77 S.Ct. 963, 982–83, 1 L.Ed.2d 931, 952–54 (1957). However, the conflict which the trial judge perceived in this case was of a different sort, and the Fifth Amendment's involvement was purely incidental. As we have shown in the preceding section of this opinion, the conflict arose when, on the one hand, the interests of appellant's union clients pointed towards disclosure, but, on the other hand, appellant was advising the individual witnesses as to whether disclosure should be made.[6] At that time, the Fifth Amendment was relevant merely as one of the many factors which counsel needed to consider. The conflict which then resulted (and which would have recurred if the union officials had been served later with similar subpoenas seeking other records) would have existed even if the witnesses' decision had been not to invoke the Fifth Amendment.[7] Whatever the eventual outcome, appellant had placed himself in a situation where conflicting loyalties could affect his professional judgment. Since the order appealed from was not grounded in any way upon the witnesses' assertion of their Constitutional rights, we find no Fifth Amendment violation in the order disqualifying appellant.

6. It cannot seriously be doubted that this was the reasoning of the trial court. In its amended order of disqualification, filed February 6, 1975, the court stated:

"Gopman argues that he has acted in a manner consistent with his duty to the individual witnesses by informing them of their right to exercise their Fifth Amendment privilege. But the Government has persuasively maintained that Gopman is under a higher duty to avoid an actual, or at least a potential, conflict between the obligations owed to the labor unions and the duties owed to the individual witnesses. The conflict is manifest. The unions have every right to expect that the circumstances underlying any suspected breaches of fiduciary duties owed to them by any officer would be fully explored and investigated without hindrance from any source. It is clear to the Court that where an attorney finds himself in a position in which it might appear that the best interests of the unions are not being served that the attorney would voluntarily extricate himself from that predicament."

The court's thinking is also clarified by the transcript of the proceedings below. At one point, the court declared from the bench:

"I am not saying that simply because they didn't respond to the Grand Jury inquiry that *necessarily creates* a conflict. But, here the whole subject matter is books and records; that is the only thing that they were asked to produce. And since the Union would want to have these books and records kept as the statute requires, it looks to me as though there is a potential conflict involved, because you have a declination to produce the records."

Transcript of hearing held January 3, 1975, at page 17.

It is true that in its final order the court spoke of the witnesses as having "pleaded the Fifth Amendment privilege in response to the Grand Jury inquiries". However, it is obvious from the order as a whole that this phrase was purely descriptive.

7. In fact, conflicts of this sort could well prejudice the individual witnesses. Union counsel might find that his loyalty to an organizational client prevented him from zealously protecting the interests of union officials who were summoned by a grand jury. For example, counsel might tend to recommend disclosure when truly independent counsel would advise the witnesses to assert the Fifth Amendment. Such a result would, of course, be as reprehensible as a tendency to favor union officials at the expense of the union's own interests. It is to avoid the possibility of either result that a court may properly exercise its power of disqualification.

## V.

Two further constitutional claims warrant a brief discussion. Appellant contends that the disqualification order violated the affected parties' First Amendment freedom of association and the various clients' Sixth Amendment right to obtain counsel of their choice. Certainly, these rights are important ones and will yield only to an overriding public interest. We do not indicate what merit, if any, appellant's arguments might have in a case where the ethical violation is relatively minor. We hold only that the public interest in a properly functioning judicial system must be allowed to prevail in the case presently before us. Appellant had placed himself in a clear conflict situation from which the district court had the duty to rescue both the lawyer and his clients.

AFFIRMED.

CLARK, Circuit Judge (dissenting).

The majority, like the district court, focuses on the potential conflict between Gopman's representation of union institutional interests and the interests of the individual union officials. With deference, I suggest that the inquiry must be limited to the effect Gopman's dual union and witness representation has upon the grand jury function. Since the union's interest parallels that of the grand jury, no obstructive conflict with that process is created by Gopman's union representation at this stage of the proceedings. I therefore respectfully dissent from the majority's approval of the district court's interference with this client-attorney relationship.

Disqualification of an attorney in the course of representation deprives his client of the right to choose counsel. As a sanction with direct constitutional repercussions, it must be prefaced by a careful balancing of the individual and public interest involved. Recently, courts in two other jurisdictions have confronted this heretofore novel question. *In re Investigation Before April 1975 Grand Jury*, 403 F.Supp. 1176 (D.D.C.1975), *vacated*, 531 F.2d 600 (D.C.Cir. 1976); *Pirillo v. Takiff*, 341 A.2d 896 (Pa.1975), *appeal dismissed and cert. denied*, 44 U.S.L.W. 3424, 423 U.S. 1083, 96 S.Ct. 873, 47 L.Ed.2d 94 (1976). These cases test for whether the harmful public effects of allowing continued witness representation by an attorney with other clients whose interests create a conflict with the grand jury function justify an encroachment on private civil liberties.[1]

The officer-witnesses who have been denied Gopman's assistance have a right to be represented by an attorney of their own choosing[2] and a right to associate for the purpose of retaining legal representation.[3] Correlatively, Gopman should be allowed to pursue his profession free from arbitrary governmental limitations.[4] None of these rights is absolute. They all may be counterbalanced against the governmental interest in the effective functioning of the grand jury.

Initially, it must be recognized that Gopman's union representation in no way inter-

---

**1.** The Pennsylvania Supreme Court in *Pirillo v. Takiff*, 341 A.2d 896 (Pa.1975) recently upheld a disqualification order prohibiting two attorneys retained by the Fraternal Order of Police from representing 12 policemen subpoenaed to testify before the grand jury. The court was concerned that the union's avowed policy of noncooperation would interfere with "the rights of any witness who might stand to gain from a strategy of cooperation with the Special Prosecutor's office . . . [and] could result in a complete frustration of the grand jury's function." *Id.* at 903.

**2.** *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) recognized the right of self-representation and emphasized

that the accused is master of his own defense and should be given freedom of choice to decide questions pertaining to his representation. *See also United States ex rel. Carey v. Rundle*, 409 F.2d 1210 (3d Cir. 1969) (accused has right to fair and reasonable opportunity to obtain particular counsel).

**3.** *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

**4.** *In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968) (disbarment); *Dent v. West Virginia*, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889).

fered with the rights of the officer-witnesses.[5] Conceding *arguendo* that a union's interest in full disclosure may be at odds with a wrongdoing officer's interest in refusing to incriminate himself, it is obvious that this hypothetically possible conflict did not taint Gopman's advice to his individual clients in this case. Nor is there a basis for assuming that the choice of counsel by the officer-witnesses was made in ignorance of the possibility that a conflict could develop if they subsequently became targets of the grand jury. In contrast to the situation faced by the other courts who have dealt with disqualification at the grand jury stage, there is not the slightest suggestion here that the rights of an innocent witness will somehow be sacrificed to protect the guilty.[6] In sum, nothing appears in the present record to indicate that the interests of the officer-witnesses are not well protected by Gopman.

More significantly, the grand jury's investigation of union corruption has not been hampered by Gopman's dual allegiances. I don't see the officers' "stonewall" as precipitated by anything other than protection of their own interest. It simply could not have been a byproduct of an improper conflict situation when the supposed conflict was a pressure for more, not less, disclosure. There is just no basis for assuming that Gopman's union ties improperly promoted non-cooperation. While it is clear that one attorney cannot serve the interest of a non-witness client who wants silence by tailoring his representation of a witness client who could serve the

truth with non-incriminating testimony, those facts are the reverse of the ones in this case. Indeed, both the majority and the government insist that the union wanted full disclosure. Thus, Gopman's association with his "other" client, the union, can create no problems for the grand jury function at this point in the criminal process.

The bare fact that Gopman's advice to his clients was to involve the Fifth Amendment's protection must never be a part of the weighing process. If Gopman had represented only the officers, he certainly could not be disqualified for instructing them to remain silent. That he gave the same advice in spite of his union-client's theoretical interest does not alter the equation. In each case, the attorney has no incentive to impede the investigatory process except insofar as the rights granted by the Fifth Amendment allow him to protect his witness-clients. Unless a showing is made that the supposed conflict could have at least an apparent ability to interfere with the grand jury function, disqualification is inappropriate.

Of course I do not insist that Gopman's dual role as union/officer advisor would always be permissible. If any individual client should become the object of criminal or civil actions as a result of illegal union activities, Gopman could not continue to counsel both that interest and those of the union. Even at this later stage, however, the courts should allow union counsel to stay long enough to ascertain the nature of the lawsuit and protect the interest of all. *Yablonski v. United Mine Workers*, 145 U.S.

---

5. *In re Investigation Before April 1975 Grand Jury*, 403 F.Supp. 1176 (D.D.C.1975), *vacated* 531 F.2d 600 (D.C.Cir. 1976), provides an instructive contrast to our case. In that litigation, 21 pressmen who worked at the Washington Post were subpoenaed before the grand jury to answer questions concerning the destruction of newspaper equipment occurring during a union strike. Acting on the general advice of the union attorney, all but two witnesses invoked the Fifth Amendment, even as to routine questions concerning age, marital status, number of children, etc. The district court chose to break the "stonewall" by requiring separate representation. In spite of poten-

tial harmful effects to innocent pressmen and the grand jury, the D. C. Circuit vacated the disqualification order and instructed the government to remedy the situation by challenging any unwarranted claims of privilege.

6. The government does not assert that the past representation by Gopman's firm of the "target" officer presents a conflict of interest with Gopman's present representation of the non-target officers. If there were any reason to believe that the witnesses' noncooperation was caused by a desire to protect the target, this case would present an entirely different issue.

App.D.C. 252, 448 F.2d 1175, 1177 (1971).[7] Unless and until such a contingency occurs, I would refuse to order disqualification.

---

**7.** As the majority points out, Gopman's practice is to voluntarily resign from the representation of any official who becomes a "target."