**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Donald E. SNYDER,**
**Defendant-Appellant.**

**No. 82–3431.**

United States Court of Appeals,
Fifth Circuit.

May 31, 1983.

Michael S. Hubley, Shreveport, La. (court-appointed), for defendant-appellant.

D.H. Perkins, Jr., Asst. U.S. Atty., Shreveport, La., for plaintiff-appellee.

Before CLARK, Chief Judge, THORNBERRY and RANDALL, Circuit Judges.

THORNBERRY, Circuit Judge:

Snyder was tried without a jury on one count of conspiracy to secure the escape of a federal prisoner, 18 U.S.C. § 371, and one count of aiding and assisting in the escape of a federal prisoner, 18 U.S.C. § 752(a). He was convicted on both counts and sentenced to serve four years on each count, the sentences to run concurrently. He filed a timely notice of appeal and is proceeding under the Criminal Justice Act with his court-appointed attorney.

Snyder raises the following points on appeal: (1) He claims that he was denied his right to a trial held under the time-table of the Speedy Trial Act, 18 U.S.C. § 3161 et seq. (2) He further claims that he was denied his right to counsel by removal of his retained counsel by court order and the court appointment of counsel before trial. (3) He attacks the sufficiency of the evidence to support his conviction on each count. (4) Finally, he asserts that his common-law wife was not adequately advised by the court of her privilege not to testify against him.

### Facts

Appellant Snyder was a federal prisoner transferred to the Shreveport city jail en route to the Lafayette Parish jail in Louisiana for trial on charges of interstate transportation of stolen property. He was placed in a cell with Garvan Dale White and

five other prisoners. White was in jail pursuant to a writ of habeas corpus *ad testificandum*. He was also a federal prisoner. Snyder claimed to have known White for 25 years, but White denied he had ever met Snyder before Snyder was placed in the cell in Shreveport. On Friday evening, October 31, 1980, two days after Snyder was put in the cell, attorney Jim Brumfield conferred with both White and Snyder for more than one hour. While sitting in the booking area, White purportedly suggested that he and Snyder escape, but Snyder dissuaded him because too many people were around. White allegedly also showed Snyder two hacksaw blades, but Snyder told him that it would take six weeks to saw their way out.

The following evening, Saturday, November 1, 1980, attorney Brumfield arrived at the jail. The jailer went to get White, but as he was escorting him down the hall, Brumfield called to the jailer for him to get Snyder too. The jailer left White in the hall, and went back to get Snyder. Snyder was in his underwear and moved to the back of the cell to put on his jumpsuit. There was nothing unusual about his being clad only in his underwear at that time of night.

White continued walking down the hallway. Neither of the jailers was watching him. Realizing that the gate to the elevator area was open, White jumped on the elevator and left. While waiting for Snyder to dress, the jailer heard the elevator operator say that White had escaped, and immediately slammed Snyder's cell door shut. By that time, it was too late to stop White. White walked out the front door of the jail and drove away in a pickup truck which he had once owned, but which was now owned by attorney Brumfield. The truck had a concealed ignition key. White was eventually apprehended and convicted of escaping from federal custody.

After questioning, Snyder made a statement at 4:30 a.m. the next morning concerning White's escape. He indicated that he and White realized that it would be relatively easy to walk out of the jail and that the only reason they had not done so on Friday night was because there were too many people around. Snyder conceded that he was biding his time, waiting for an opening to enter the elevator and then walk out of the building. His statement also indicated that White had asked him to refrain from putting on his jumpsuit when attorney Brumfield first arrived and that he, Snyder, had a feeling that White was going to try to take the opportunity to walk out. In addition to this statement, Snyder also testified in state proceedings against attorney Brumfield who had also been indicated for aiding White to escape.

### 1. Speedy Trial

Snyder contends he was not brought to trial within the 70 day period required by the Speedy Trial Act. 18 U.S.C. § 3161(c)(1). His first claim is that the Speedy Trial Act period began to run on November 4, 1981, the day he was indicted. It is clear, however, that he was arraigned on November 13, 1981. Where a defendant is arraigned after he is indicted, the statutory time period starts to run on the date of the arraignment.[1]

Snyder acknowledges that the 43 day period during the pendency of his psychiatric examination is an excludable period under 18 U.S.C. § 3161(h)(1)(A). He objects, however, to excluding the period during which his pretrial motions were pending because he claims they were not given prompt disposition as required by 18 U.S.C. § 3161(h)(1)(F).

The record shows that his retained counsel, Mr. Brumfield, filed pretrial motions on November 24, 1981, and that Brumfield was disqualified by the court on March 5, 1982,

---

1. The Speedy Trial Act provides:

 In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within *seventy days* from the *filing* date (and mak-
 ing public) *of the information* or indictment, or from the date the defendant has *appeared before a judicial officer* of the court in which such charge is pending, *whichever date last occurs . . . .*

 18 U.S.C. § 3161(c)(1) (emphasis added).

because he had also been indicted for aiding in the escape of prisoner White. Approximately a month and a half later, on April 23, 1982, Snyder's court-appointed counsel adopted the prior pretrial motions. A magistrate recommended that they be denied on May 26, 1982, and the district judge denied them on June 8, 1982, the day Snyder's trial began.

■ Snyder argues that the government delayed rulings on his motions until it could have his counsel disqualified and develop its case against him. Although there is no evidence to support this, even assuming this to be true, Snyder did not press for an earlier ruling on his motions. In addition, the difficulties with respect to his retained counsel obviously justified a delay in the final resolution of those motions.

■ We conclude that Snyder was tried within the limits of the time requirements of the Speedy Trial Act.

### 2. Right to Counsel

■ Snyder contends that he was denied his right to counsel under the sixth amendment to the United States Constitution when the district court disqualified his retained counsel without affording him the opportunity to waive his right to conflict-free counsel under *United States v. Garcia,* 517 F.2d 272, 275–7 (5th Cir.1975).[2]

Relying on *United States v. Salinas,* 618 F.2d 1092 (5th Cir.), *cert. denied,* 449 U.S. 961, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980), the district court held that the public interest in the fair and orderly administration of justice outweighed Snyder's right to counsel of his choice:

2. For purposes of the sixth amendment argument, we see no material difference between the district court's alleged failure to give Snyder an opportunity to waive his right to counsel, and a hypothetical refusal by the court to allow Snyder to waive his right to a conflict-free counsel. The record is clear that Snyder opposed the government's motion to disqualify his retained counsel, and we think it clear that Snyder would have waived his right to a conflict-free counsel. For the same reasons, the fact that Snyder subsequently failed to object to the disqualification and substitution of counsel does not alter the procedural posture of this

In this case, the attorney is more than a "target" of investigation; he is an indicted co-conspirator. This court recognizes that under *United States v. Garcia,* 517 F.2d 272 (5th Cir.1975), a defendant may waive his right to conflict-free counsel. A waiver, however, will not eliminate this court's responsibility to balance the right to one's own counsel with the court's interest in preserving the integrity and the fair administration of justice. In the case before the court, the scales weigh heavily against that right of the defendant. In consideration of the conflict that exists due to Brumfield's position as counsel for a person who was a witness for him and the present posture of Brumfield and Snyder as indicted co-conspirators, this court must disqualify Brumfield as counsel in this case.

We agree. However, before we reach the merits, we must first determine the standard of review governing orders disqualifying counsel in criminal cases.

A review of the cases in our Circuit reveals two conflicting lines of authority. In *Woods v. Covington County Bank,* 537 F.2d 804 (5th Cir.1976), we stated:

As we have previously indicated, a District Court is obliged to take measures against unethical conduct occurring in connection with any proceeding before it. *Sanders v. Russell,* 5 Cir., 1968, 401 F.2d 241, 246; *see Ceramco, Inc. v. Lee Pharmaceuticals,* 2 Cir., 1975, 510 F.2d 268, 270–71; *E.F. Hutton & Co. v. Brown,* S.D.Tex., 1969, 305 F.Supp. 371, 376–77. While disqualification orders issued pursuant to this supervisory authority have

case. Snyder opposed the disqualification motion at the outset. Had he desired, he could have immediately appealed the order disqualifying counsel. *United States v. Hobson,* 672 F.2d 825, 826 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982); *Cossette v. Country Style Donuts, Inc.,* 647 F.2d 526, 528 n. 2 (5th Cir.1981); *Woods v. Covington County Bank,* 537 F.2d 804, 809 (5th Cir.1976). We see no reason for requiring Snyder to do any more following the order disqualifying his counsel in order to preserve his claim of error here.

been held to be within the discretion of the lower court, courts have recently expressed "serious reservations" about whether the scope of appellate review is limited to finding an abuse of discretion in disqualification cases where only a purely legal question is at issue. *Kroungold v. Triester*, 3 Cir., 1975, 521 F.2d 763, 765 n. 2, *quoting American Roller Co. v. Budinger*, 3 Cir., 1975, 513 F.2d 982, 985 n. 3; *see Kramer v. Scientific Control Corp.*, 3 Cir., 1976, 534 F.2d 1085, 1088. In disqualification cases such as this, where the facts are not in dispute, District Courts enjoy no particular functional advantage over appellate courts in their formulation and application of ethical norms. Thus, in this circuit, we have reviewed disqualification cases as we would most other appeals of a judge's findings, applying the "clearly erroneous" test to issues of fact while carefully examining a District Judge's application of relevant ethical standards. *See, e.g., American Can Co. v. Citrus Feed Co.*, 5 Cir., 1971, 436 F.2d 1125 (disqualification order reversed because contrary to controlling ethical principles); *Uniweld Products, Inc. v. Union Carbide Corp.*, 5 Cir., 1967, 385 F.2d 992, *cert. denied*, 390 U.S. 921, 88 S.Ct. 853, 19 L.Ed.2d 980 (1968) (refusal to disqualify upheld because factual determination not clearly erroneous). Consequently, we are empowered in this case to determine whether the District Court's disqualification order was predicated upon a proper understanding of applicable ethical principles. *Id.* at 810 (footnote omitted). Under *Woods*, therefore, an appellate court reviewing disqualification orders must apply the clearly erroneous test to questions of fact while "carefully examining a District Judge's application of relevant ethical standards." *Id.* We followed the rule set forth

in *Woods* in *Cossette v. Country Style Donuts, Inc.*, 647 F.2d 526, 530 (5th Cir.1981), and in *Brennan's Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 171 & n. 3 (5th Cir.1979). *See also Norton v. Tallahassee Memorial Hospital*, 689 F.2d 938, 941 (11th Cir.1982).

However, in a case decided three months before *Woods, In re Gopman*, 531 F.2d 262 (5th Cir.1976), we held that "[t]he proper standard for our review of a disqualification order is whether the trial judge abused his discretion." *Id.* at 266. In that case, we reasoned that the disqualification order had been issued pursuant to the trial court's inherent "power to regulate the [unethical] conduct of attorneys practicing before it." *Id.* We followed *Gopman* in *United States v. Salinas*, 618 F.2d 1092 (5th Cir.), *cert. denied*, 449 U.S. 961, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980).

■ We believe that this conflict was correctly resolved by the Eleventh Circuit in *United States v. Hobson*, 672 F.2d 825 (11th Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982), where the court stated: "We believe that in criminal cases, where the defendant's sixth amendment right to counsel is implicated, the conflict in our prior cases should be resolved in favor of the accused. The abuse of discretion standard is simply too deferential where such a fundamental constitutional right is affected." *Id.* at 827 (referring to the conflict in the Fifth Circuit).[3] We conclude that the *Woods* standard, which provides a higher degree of protection for a defendant's sixth amendment right to counsel, is the proper standard in criminal cases. We therefore hold that the standard of review of challenged disqualification orders in criminal cases is simple error. We would, however, apply the clearly erroneous standard to related issues of fact.

**3.** In *Brennan's*, we read *Gopman* to mean that where the facts revealed clear conflict of interest between the attorney and his client, disqualification was clearly required, and it would have been an abuse of discretion *not* to disqualify the attorney:

[T]he issue before the [*Gopman*] court was whether the district court had correctly

found that a conflict of interest existed. We deferred to the lower court's finding that the attorney was faced with divided loyalties. That fact having been found, disqualification was clearly required.

*Brennan's*, 590 F.2d at 171 n. 3.

The findings of fact upon which the district court based its order disqualifying counsel are not clearly erroneous. Therefore, we need only analyze whether the court erred in applying these facts. A court disqualifying an attorney may base its ruling on one of two grounds: (a) conflict of interest, and (b) integrity of the judicial system. Under the conflict of interest analysis, the trial judge ordinarily attempts to determine whether the interests of the attorney conflict with those of his client. A finding that there is a conflict does not, however, end the analysis. In *United States v. Garcia*, 517 F.2d 272 (5th Cir.1975), we recognized that defendants may waive their right to conflict-free representation. *Id.* at 275. An accused's right to waive conflict-free representation may not be absolute. Where the conflict of interest was so serious as to render a trial inherently unfair, we have held that the accused has been deprived of his right to effective assistance of counsel. *Uptain v. United States*, 692 F.2d 8, 10 (5th Cir.1982). We did not reach the issue whether under such circumstances, the right to effective assistance of counsel was waivable. *Id.* at 11. Similarly, we need not reach this issue here, for we conclude that disposition of this case is controlled by the second factor mentioned above, the integrity of the judicial process. As we held in *Woods, supra,* the policy concern underlying this factor is set out in Canon 9 of the A.B.A. Code of Professional Responsibility, which provides that an attorney "should avoid even the appearance of impropriety." "The purpose of Canon 9 is to preserve public confidence in the bar and in the legal process." *United States v. Hobson*, 672 F.2d at 828. Since a rigid application of Canon 9 may have other undesirable social costs, *see Woods,* 537 F.2d at 812–13, we have developed a two-pronged test governing disqualifications of attorneys under Canon 9. First, "there must be at least a reasonable possibility that some specifically identifiable impropriety did in fact occur." *Woods,* 537 F.2d at 813.[4] Second, there must be likelihood of public suspicion or obloquy which would outweigh the social interests served by a lawyer's continued participation in a particular case. *Woods,* 537 F.2d at 813 n. 12. "Under Canon 9, an attorney should be disqualified only when both of these standards have been satisfied." *Id. See also Hobson, supra,* 672 F.2d at 828. Under this analysis, a defendant cannot waive his right to be represented by a lawyer who is innocent of serious impropriety, "because the ethical violation involves public perception of the lawyer and the legal system rather than some difficulty in the attorney's effective representation of [the defendant]." *Hobson,* 672 F.2d 829.

Applying these principles to the case before us, we believe that Canon 9 presents an appropriate basis for affirmance of the district court's decision. The first prong of the test is easily satisfied. The record is clear that both Snyder and Brumfield were deeply involved in White's escape attempt. There is no doubt that "some identifiable impropriety did in fact occur."

The second prong is more difficult to apply, because we must balance the likelihood of public suspicion against the social interests served by Brumfield's continued representation of Snyder. Although the sixth amendment's right to counsel in criminal cases is absolute, an accused's right to a *particular* counsel is not. *United States v. Silva,* 611 F.2d 78, 79 (5th Cir.1980); *United States v. Kitchin,* 592 F.2d 900, 903 (5th Cir.1979), *cert. denied,* 444 U.S. 843, 100 S.Ct. 86, 62 L.Ed.2d 56 (1980).[5]

---

**4.** We wish to stress that this aspect of the analysis focuses solely on past improprieties. Where there is a reasonable possibility that some impropriety might occur in the future, other, less harsh sanctions, might be more appropriate. *Norton v. Tallahassee Memorial Hospital,* 689 F.2d 938, 941 & n. 4 (11th Cir. 1982).

**5.** We do not wish to minimize the importance of a criminal defendant's right to the counsel of his choice. "[T]he interest in permitting a criminal defendant to retain counsel of his choice is strong, and deserves great respect." *Hobson,* 672 F.2d at 828. However, in some cases, the public interest in maintaining the integrity of the judicial process may outweigh

After a careful review of the record before us, we conclude that the likelihood of public suspicion outweighs the social interests served by Brumfield's continued representation of Snyder. Snyder's state court testimony incriminated him, and exculpated Brumfield. The government argues, and we agree, that in order to defend Snyder, Brumfield would have to question Snyder's state court testimony, and in the process, would be required to inculpate himself. Moreover, since the record is clear that Brumfield was deeply involved in White's escape attempt, an ordinary person could only conclude that Brumfield in fact engaged in highly unethical and illegal conduct. Brumfield's integrity and credibility would thus be severely impugned in the eyes of the public. Finally, an ordinary person could reasonably find Brumfield's continued representation of Snyder improper after it became clear that Brumfield was not only a fact witness to the underlying crime, but was already indicted for his participation in it. Allowing a lawyer who has been indicted for the same crime with which his client is charged to represent that client would not only arouse public suspicion, but would shock the public's sensibilities outright. We conclude that these facts could undermine and erode the public's confidence in the integrity of our judicial system, precisely the type of harm Canon 9 was designed to prevent. *See Hobson,* 672 F.2d at 829; *United States v. Salinas,* 618 F.2d 1092, 1093 (5th Cir.), *cert. denied,* 449 U.S. 961, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980) (attorney who was target of an investigation relating to the same offense in which he was representing his client properly disqualified in view of public interest in fair administration of justice). Finally, since an accused may not waive his counsel's disqualification under Canon 9, Snyder's desire to retain Brumfield must yield to the policy interests embodied in Canon 9. We hold that the trial court did not err in disqualifying Brumfield.

### 3. Sufficiency of the Evidence

Snyder urges that the evidence was insufficient to convict him beyond a reasonable doubt upon either of the two counts. His trial was before the court. The proper standard of review is whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. Shaddix,* 693 F.2d 1135, 1137 (5th Cir.1982); *U.S. v. Bell,* 678 F.2d 547, 549 & n. 3 (5th Cir.1982) (en banc). The defendant's challenge to the sufficiency of the evidence, however, must be viewed in the light most favorable to the government with all reasonable inferences and credibility choices made to support it. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

A careful review of the record convinces us that the evidence supports appellant's guilt on both counts beyond a reasonable doubt. Snyder and White discussed possible escape plans. The trial court found that they reached an agreement that when attorney Brumfield came to the jail, Snyder would delay the jailer in bringing him out of his cell by distracting his attention and giving White time to get to the elevator. The court also found that White did escape while Snyder was putting on his jumpsuit.

The district court credited the testimony of Snyder in the state court proceeding, and the testimony of Snyder's female companion who he claims was his common-law wife. Snyder testified that White had discussed with him the possibility of Snyder coming to South America to maintain an airstrip that White had there. White also suggested that Snyder contact Brumfield, who would put Snyder in touch with White's relatives. Those relatives, in turn, would know where White was. Snyder testified that White told him he was involved in marijuana smuggling from South America.

Snyder argues he was merely a pawn in the escape scheme of White and attorney Brumfield. But the district court fulfilled its necessary role in making credibility choices. Under those choices Snyder was

the right of a defendant to counsel of his choice.

proved guilty beyond a reasonable doubt, both as to the conspiracy to aid in the escape and the actual aiding in the escape.

#### 4. Testimonial Privilege

Finally, Snyder contends that the district court failed to advise his "former common-law wife" that she could assert a privilege not to testify against him. His alleged common-law wife asserted that she was never married to him, although she lived with him at one time. They were not living as man and wife at the time Snyder made the incriminating statements to her, nor at the time she was called to testify.

 The testimonial privilege between husband and wife requires a valid marital relationship. It does not include situations in which the parties are merely living together. *United States v. Mathis,* 559 F.2d 294, 298 (5th Cir.1977). The record also makes it clear that his alleged former common-law wife expressed a willingness to testify, and was not coerced in any way. The most that appellant claims in his brief is that he and his alleged common-law wife "were for all practical purposes husband and wife." This does not make their relationship a marital relationship. There was no proof of a common-law marriage. A common-law marriage is as valid in the law as any other marriage and requires a divorce for its termination. No claim of such a binding marriage is made by appellant or his alleged common-law wife in this case, and there is nothing in the record to establish such a marital relationship.

#### Conclusion

We have carefully reviewed the record in this case. We find no violation of the Speedy Trial Act, no error in the judge's disqualification of appellant's counsel who was under indictment for the same offense, a clear sufficiency of the evidence in the record to establish guilt beyond a reasonable doubt, and no violation of the testimonial privilege between husband and wife.

The verdict and sentence of the district court are AFFIRMED.