**John LELSZ, et al., Individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**John J. KAVANAGH, M.D., et al., Defendants.**

**Civ. A. No. 3–85–2462–H.**

United States District Court, N.D. Texas, Dallas Division.

May 20, 1991.

David Ferleger, J.D., Philadelphia, Pa., Garth Corbett, Advocacy, Inc., Austin, Tex., Paul Smith, PART, Washington, D.C., for plaintiffs.

Lou Bright, Asst. Atty. Gen., Austin, Tex., for defendants.

MEMORANDUM OPINION
AND ORDER

SANDERS, Chief Judge.

Pursuant to the Court's Order entered April 25, 1991, a hearing was held on May 10, 1991 to determine whether sanctions should be imposed upon Defendants' lead attorney in this case, a Texas Assistant Attorney General (the "Assistant AG"). For the reasons stated below, the Court finds a pattern of misconduct on the part of the Assistant AG that merits sanctions. Over the past five months, the Court has repeatedly chastised Defendants' counsel and issued warnings regarding conduct violative of the Court's decision in *Dondi Properties Corp. v. Commerce Savings and Loan Ass'n*, 121 F.R.D. 284 (N.D.Tex. 1988) (en banc). Despite these warnings, the Assistant AG persisted in using litigation tactics that prejudiced the rights of her adversaries and undermined the administration of justice in this Court.

The Assistant AG is a zealous and tireless advocate for her clients. Her conduct in this litigation over the past several months, however, has been characterized by *ad hominem* attacks on counsel representing Plaintiffs and Plaintiff–Intervenor Advocacy, Inc.; motions filed in bad faith; a lack of candor with the Court; last-minute "drop everything" filings of motions requiring immediate action by the Court and preventing responses by her opponents; and obstructionist conduct that has wasted the resources of the Court's Expert Consultant, Dr. Linda R. O'Neall,[1] and compelled the Court to sever issues from a hearing scheduled for May 28, 1991. In light of this pattern of conduct, the Court has decided to remove the Assistant AG from further participation in this litigation.

I.  Facts.

■  By motion filed December 5, 1990, Defendants sought protection from depositions of several Texas Department of Mental Health and Mental Retardation ("TDMHMR") officials that had been noticed for December 6, 1990.[2] In a Memorandum Opinion and Order entered December 5, 1990, the Court denied the requested protective order, but noted that the request had been made even though Defendants' counsel knew that two of the TDMHMR officials would be out of the state at the time their depositions were noticed, and that the Court was not informed of their absence until the morning the Order was issued. *See* Memorandum Opinion and Order entered December 5, 1990, at 5. Not explicitly mentioned in the December 5 Order, but worthy of comment in light of subsequent events, is the fact that Defendants' counsel had telephoned the Court several days earlier, requesting informal leave to file the motion at last minute because of pressing personal problems and an overwhelming caseload. Although she knew of the TDMHMR officials' absence from Texas before filing the December 5 motion, Defendants' counsel gave the Court no warning, choosing instead to spring the information on the Court to effectively, if temporarily, defeat the Court's denial of the requested protective order.

In the December 5 Order, the Court found that Defendants' counsel's conduct "reveal[ed] a troubling disdain for the Court and the discovery process." *Id.* The incident also revealed a complete lack of candor and a failure to diligently inform the Court of a material fact. The Court stated that "[i]t is distressing for the Court to make efforts to accommodate the parties' requests for expedited consideration

---

1. As Expert Consultant Dr. O'Neall's duties are similar to those of a special master. She was appointed by the Court on the recommendation of the parties to this litigation pursuant to the Resolution and Settlement the parties entered into in 1983. *See* Resolution and Settlement filed July 19, 1983 ¶ 36, at 14–17 (providing for Expert Consultant and explaining her duties in detail); Joint Motion filed March 5, 1984 (moving for selection of Dr. O'Neall as Expert Consultant); Order entered March 19, 1984 (appointing Dr. O'Neall expert Consultant). The

Implementation Agreement provides that "Linda O'Neall shall continue as Expert Consultant." Implementation Agreement filed October 15, 1987, at ¶ 62.

2. Although Defendants' December 5 motion was signed by one of the attorneys the Assistant AG supervises, it was done with her knowledge and consent, and at the May 10 hearing the Assistant AG adopted the motion as her own.

of motions, extensions of time, and special consideration of the circumstances of counsel, only to be blind-sided by [Defendants'] last-minute notification of deponents leaving town." *Id.* The Court lamented "the parties' attorneys' apparent eagerness to quarrel over almost every aspect of discovery" and concluded by stating that "[t]he parties and their counsel are reminded that the Court has other cases before it that merit time and attention and that the Court's ruling in *Dondi Properties Corp. v. Commerce Savings and Loan Ass'n,* 121 F.R.D. 284, 284–96 (N.D.Tex.1988) (en banc), shall be rigorously enforced in this action." *Id.*

At the May 10 hearing, the Assistant Attorney General conceded that she knew of the TDMHMR officials' absence from the state before filing the motion, yet contended that the motion was filed in good faith. The Court finds that the December 5, 1990 motion was filed in bad faith and in violation of the Court's ruling in *Dondi Properties Corp. v. Commerce Savings and Loan Ass'n.*

■ On Friday, February 1, 1991, Defendants' counsel again filed a last-minute motion seeking to prevent the Expert Consultant, Dr. Linda R. O'Neall, from conducting on-site reviews of interim measures [3] at the Austin State School, Fort Worth State School, and San Antonio State School.[4] The reviews were scheduled to begin the following Tuesday, so relief had to be granted, if at all, no later than Monday, February 4, 1991. *See* Memorandum Opinion and Order entered February 4, 1991, at 1, 2 (stating that "Defendants request immediate relief from the Court, and by filing this motion at the last minute the Attorney General effectively guaranteed that Plaintiffs and Intervenor PART would be disad-

vantaged in preparing their responses"). In denying the motion, the Court noted that despite weeks—actually, months—of notice as to when the interim measures reviews would begin, the Attorney General chose to spring this motion on the parties and the Court the day before it must be decided.

The Court finds particularly disturbing the annoyance and burden Defendants' request inflicts upon the Expert Consultant, her staff, and the experts she brings to Texas for the interim measures reviews. Indeed, the timing of the present motion constitutes treatment of the Expert Consultant that can only be characterized as unprofessional, oppressive, and rude.

*Id.* at 3. The Court then briefly recounted the events of the previous December, and once again cited the Court's decision in *Dondi. See id.* at 4–5. The Court denied Defendants' motion to prevent the Expert Consultant's on-site reviews because it found the motion was filed in violation of the *Dondi* standards. *See id.* at 6.

Although Defendants' counsel subsequently stated that she "did not intend to act in a manner which could be interpreted by the court or perceived by the Expert Consultant as 'rude, oppressive and unprofessional' ", Defendants' Response to the Court's Order of February 4, 1991, filed February 11, 1991, at 1, the Assistant AG neither apologized for her conduct nor, it appears, consulted *Dondi.* Also, while Defendants' counsel stated that she waited until the last moment to file the motion "to conserve judicial time", her Response conceded that "Defendants' attorneys admittedly could have filed their motion [on December 28, 1990]." *Id.* at 2. Furthermore, unlike the December incident, in this case Defendants' counsel did not even bother to

3. "Interim measures" refers to the provisions of Paragraphs 6 through 10 of the Implementation Agreement entered into by the parties on October 15, 1987. The interim measures concern medical services (¶ 6); behavior treatment programs (¶ 7); education and vocational programs (¶ 8); preventing, reporting, and investigating abuse, neglect, and injuries (¶ 9); and filling professional treatment positions at the state schools (¶ 10).

4. Although Defendants' February 1 motion was signed by an attorney working under the supervision of the Assistant AG, it was done with her knowledge and consent, and at the May 10 hearing the Assistant AG adopted the motion as her own. Furthermore, Defendants' Supplementation to Their Motion to Limit the Monitoring by the Expert Consultant of the Interim Measures and Request for Expedited Ruling, filed February 4, 1991, bears the Assistant AG's signature.

telephone the Court with informal notice of her intent to file the February 1 motion.

At the May 10 hearing the Assistant AG stated that the motion was filed in good faith and with the hope of an immediate and favorable response by the Court. The Court finds that the February 1 motion was filed in bad faith and in violation of the standards of attorney conduct adopted by this Court in *Dondi Properties Corp. v. Commerce Savings and Loan Ass'n.*

The Court's February 4 Order set a hearing, scheduled for May 28, on Defendants' compliance with the Implementation Agreement. The discovery process related to that hearing increased the Court's need to remind Defendants' counsel of the *Dondi* standards.

On April 5, 1991 the Assistant Attorney General filed a motion seeking a protective order regarding depositions of Accreditation Council on Developmental Disabilities ("ACDD") officials, suggesting that by deposing these officials Plaintiffs would attempt to influence the methods or outcomes of ACDD accreditation surveys, in violation of Paragraph 3 of the Implementation Agreement. *See* Defendants' Motion for Protective Order Regarding Depositions of ACDD Officials, filed April 5, 1991 (quoting Implementation Agreement ¶ 3 in stating that "[n]o party or agent acting on behalf of a party shall attempt to influence the methods or outcomes of ACDD accreditation surveys").

The April 5 motion was based on the Assistant AG's unsubstantiated insinuation that Plaintiffs' counsel would use the depositions to intimidate and harass the ACDD officials with the goal of preventing further accreditation being granted to TDMHMR facilities. Bluntly put, the Assistant AG accused Plaintiffs' and Advocacy's attorneys of noticing depositions with the intent of violating an order of this Court, as well as fundamental standards of attorney conduct. At the May 10 hearing the Assistant AG admitted that she had made no inquiry into the factual basis of her motion, but instead filed it based on her general understanding of the discovery process and her personal feelings about Plaintiffs' counsel.[5]

In its Order denying Defendants' motion the Court found that "Defendants' suggestion of [an improper] motive on the part of Plaintiffs' [counsel] is extremely improper and unprofessional, and violative of this Court's ruling on attorney conduct. *See Dondi Properties Corp. v. Commerce Savings and Loan Ass'n*, 121 F.R.D. 284, 284–96 (N.D.Tex.1988) (en banc)." Memorandum Opinion and Order entered April 19, 1991, at 3.

█ It is proper for an attorney to object to requested discovery on the ground that it is unreasonably burdensome. *See* Fed. R.Civ.P. 26(b)(1)(iii). Such an objection must, however, be supported by facts, and not merely speculation or personal animosity.[6] *See* Fed.R.Civ.P. 11.

---

**5.** Defendants also grounded their motion on the argument that less intrusive discovery methods, such as affidavits, could provide Plaintiffs and Advocacy with the requested information. Plaintiffs already had attempted to use less intrusive methods of discovery, however. On October 1, 1990 Plaintiffs' counsel wrote the Expert Consultant expressing several specific concerns regarding whether the ACDD surveys were being conducted in accordance with the pertinent provisions of the Implementation Agreement. After the surveys were completed, the Expert Consultant asked the Chief Executive Officer of ACDD, Dr. James F. Gardner, to address Plaintiffs' counsel's concerns. Dr. Gardner responded by letter dated February 20, 1991, but his response left unclear whether the ACDD surveys had been conducted in full compliance with the governing provisions of the Implementation Agreement. *Compare* Defen-

dants' Reply to Plaintiffs' Response to Defendants' Motion to Reconsider Summary Judgment, filed April 16, 1991, Ex. 1 (letter from Dr. Gardner to Dr. O'Neall dated February 20, 1991), *with* Implementation Agreement entered October 15, 1987, ¶¶ 1, 3.

**6.** The April 5 motion was not an isolated incident of the Assistant AG attacking opposing counsel personally. In an April 22 filing, the Assistant AG made references to "Plaintiffs' attorneys bad faith in scheduling discovery", "the intentional surprise of plaintiffs' [ten days'] notice", which was "not, in defendants' opinion, calculated to do anything but make it impossible for defendants' counsel to schedule around those visits" and constituted an "attempt[ ] to surprise and harass defendants". Defendants' Reply to Plaintiffs' Motion for Sanctions, filed April 22, 1991, at 1, 2, 3. That filing also assert-

More recently, the Court attempted to accommodate Defendants' concerns about Plaintiffs' and Advocacy's experts' tours of TDMHMR facilities by having the Expert Consultant establish rules for their conduct; Defendants alternatively were allowed to have Dr. O'Neall present during the tours if they did not wish to abide by rules established by Dr. O'Neall. *See* Defendants' Motion for Protection, filed April 12, 1991, at 4 (requesting that "this Court to issue an order prohibiting expert tours or alternatively limiting the manner in which they are conducted"); Order entered April 16, 1991, at 1 (stating that, in order to accommodate the concerns of the parties, all experts shall abide by procedures approved by the Expert Consultant or arrange for her presence during the tours).

Even though the Expert Consultant issued her rules after consulting with the parties, Defendants' counsel objected to them. After a new set of rules was issued in an attempt to accommodate the Assistant AG's concerns, and with the apparent consent of Defendants, the Assistant AG raised new objections. Each time Dr. O'Neall developed a new set of rules, the Assistant AG raised new objections. *See* Plaintiffs' Ex. 2 (correspondence concerning attempts to establish rules for expert reviews of TDMHMR facilities).

In response to Dr. O'Neall's request for guidance, the Court ordered Dr. O'Neall to travel from her office in Florida to Texas to supervise the expert tours. This unnecessary diversion of the Expert Consultant compelled the Court to sever certain issues from the May 28 hearing.

Of course, Dr. O'Neall and her staff cannot be in two places at once; neither can they produce reports while supervising experts and squabbling attorneys. Because of the unnecessary drain on the Expert Consultant's resources caused by Defendants' inability to accept rules for the expert visits, she will not be able to produce all of the reports necessary for the May 28 hearing in a timely manner. Reluctantly, then, the Court is compelled to GRANT Defendants' Motion to Sever Community Issues from the May 28, 1991, Hearing on Compliance with the Implementation Agreement. That part of the motion asking the Court to postpone discovery is DENIED. The Court stresses that the sole reason for granting this motion is the constant bickering of the parties' attorneys and, more particularly, the repeated objections of Defendants' counsel that are discussed in Dr. O'Neall's letters of April 23 and 24.

Order entered April 24, 1991, at 2–3.

It is important to note that the Court issued the April 16 Order in order to accommodate concerns raised by the Assistant AG's April 12 motion for protection, only to have her undermine the purpose of that Order by her obstructionist conduct. The Assistant AG admitted at the May 10 hearing that she consented to rules during a discussion with Dr. O'Neall on a Sunday evening, only to object to them on Monday. Although she could have opted for the presence of the Expert Consultant at the tours upon first reviewing the Expert's rules and finding them unacceptable, the Assistant AG instead consumed days of Dr. O'Neall's time and forced the Court to grant Defendants' motion to sever for no reason other than her improper conduct. The most revealing part of this episode is the fact that, within two days of issuing the April 24 Order directing Dr. O'Neall to travel to Texas, the Assistant AG agreed to a set of rules that negated the need for Dr. O'Neall's presence at the expert tours.

---

ed that "Defendants believe it is entirely for the purpose of obfuscating the issues that Advocacy" filed the "vituperative motion" for sanctions and that the noticed discovery was "intentionally planned to be burdensome, harassing and uselessly time-consuming." *Id.* at 6.

Similarly, the Assistant AG's attorney's opening statement at the May 10 hearing contained an attack on Plaintiffs' counsel, arguing that Plaintiffs' motions for sanctions were an at-

tempt to gain an unfair advantage at the May 28 hearing and therefore were themselves violative of the *Dondi* standards. Because Plaintiffs' original motion for sanctions was largely based on the Court's repeated *Dondi* warnings to Defendants' counsel, and Plaintiffs' second sanctions motion merely reurged the first motion based on a separate incident, the accusation rang hollow.

■ The point here is not the quality of the Expert Consultant's proposed rules or the validity of the Assistant AG's objections to them. Rather, the point is that the Assistant AG chose to have the expert tours governed by Dr. O'Neall's rules, but then refused to accept any rules until the Court directed Dr. O'Neall to travel to Texas. The Assistant AG uselessly wasted the Expert Consultant's and the Court's time, and forced the Court to sever issues from the May 28 hearing for no legitimate reason. The Court finds that the Assistant AG's conduct in this matter was inexcusable and an adequate justification for sanctions.

■ Finally, the Court addresses the incident that prompted the May 10 hearing. *See* Order entered April 25, 1991 (setting hearing on sanctions and discussing seven episodes of possible attorney misconduct). On April 16, 1991, the Assistant Attorney General filed Defendants' Objection to the Expert Consultant's Budget. Defendants' first objection was that "they first received the Expert Consultant's Budget in mid-March."[7] Defendants' objection to this allegedly late submission of the budget was two-fold: first, because some 1800 hours were billed retrospectively, Defendants' mid-March receipt of the budget rendered objection to those hours "meaningless." Second, Defendants indicated that Dr. O'Neall's mid-March submission of the budget violated Paragraph 62 of the Implementation Agreement.

The Expert Consultant's Response to Parties' Comments on the Budget, filed April 25, 1991, challenged the veracity and sincerity of the Assistant Attorney General's April 16 filing. Dr. O'Neall's Response, along with her unrebutted testimony at the May 10 hearing, established that Defendants' counsel was aware of the Expert Consultant's difficulties preparing this year's budget months ago. Indeed, discussions between Dr. O'Neall and Defendants'

counsel about difficulties in preparing the budget began in November, 1990.

The principal and perennial problem faced by the Expert Consultant in preparing her annual budget is the fact that the scope of her duties is determined by the results of the previous year's monitoring surveys. Those surveys are conducted in the fall, with the winter months devoted to preparing the reports which serve as the foundation for the next year's budget. In the past, the Expert Consultant and Defendants' counsel established a practice whereby the budget was submitted after the annual reports were completed—usually in February or March.

This year, the Expert Consultant faced special problems developing her budget, problems of which Defendants' counsel was fully informed. One such problem was Defendants' "motions to the Court to prevent the Expert Consultant from further monitoring activities and the subsequent order for a hearing, the purpose of which, in part, is to determine the future intensity and scope of monitoring." Expert Consultant's Response to Parties' Comments on the Budget at 2. Because a budget for the latter half of 1991 could not reasonably be submitted until after the May 28 hearing, the Expert Consultant and Defendants' counsel discussed alternative methods for developing the budget, including monthly, quarterly, and semi-annual budget cycles for the year. *See id.* Despite these problems, Dr. O'Neall submitted her budget to Defendants in mid-March, at about the same time past budgets had been submitted and several weeks before she served it on the other parties and filed it with the Court.

It is undisputed that all of this was known by Defendants' counsel. Furthermore, the Assistant AG testified that never before had she objected to a proposed budget on the basis of lack of timeliness. The Assistant Attorney General also testified that she did not inform the Expert Consul-

---

7. Defendants' other objections were directed at the Court, not the Expert Consultant. Defendants' second objection was that the May 28 "hearing is unnecessary and wastes precious dollars and human resources." Defendants'

third objection also concerned the hearing, arguing that "[i]t modifies the parties['] agreement to require defendants to pay for" the extra costs associated with the hearing.

tant that Defendants would object to a budget filed in accordance with the parties' previous practice. Nor did Defendants' counsel mention to Dr. O'Neall during the course of months of discussions that Defendants considered her delay in submitting the budget a violation of the Implementation Agreement—that is, that Dr. O'Neall was in contempt of the Court's Order governing this case.

In the April 25 Order setting the May 10 hearing the Court questioned whether Defendants' objections to the proposed budget violated Federal Rule of Civil Procedure 11, which requires that papers filed in federal court be well grounded in fact and law. *See* Order entered April 25, 1991, at 2. Although Defendants' desire for earlier submission of the Expert Consultant's annual budget may be reasonable, the facts show that Defendants' suggestion that Dr. O'Neall was in contempt of a court order is simply an insupportable accusation that was made in bad faith.

## II. Analysis.

This is a prolonged and complex class action aimed at securing the rights to decent care and treatment for thousands of mentally retarded citizens of Texas. Because, for different reasons, neither the Texas Department of Mental Health and Mental Retardation nor the plaintiff class-members can speak for themselves, the quality of justice that can be achieved in this case depends in very large measure on the attorneys who speak and act for the parties. The fact that the plaintiff class-members are in the care and custody of their legal opponents further complicates matters, so that Defendants cannot ethically adopt a no-holds-barred legal strategy because they have a legal duty to care for Plaintiffs, and Plaintiffs have a duty to avoid draining Defendants' resources through litigation rather than the provision of services.[8]

It is clear that a district court is obliged to act against improper conduct occurring in any proceeding before it. *See Musicus v. Westinghouse Electric Corp.,* 621 F.2d 742, 744 (5th Cir.1980); *Woods v. Covington County Bank,* 537 F.2d 804, 810 (5th Cir.1976); *Sanders v. Russell,* 401 F.2d 241, 246 (5th Cir.1968); *Dondi Properties Corp. v. Commerce Savings and Loan Ass'n,* 121 F.R.D. at 286–87. "Authority clearly supports the right of a trial judge to regulate the conduct of attorneys during the course of a case." *United States v. Salinas,* 618 F.2d 1092, 1093 (5th Cir.), *cert. denied,* 449 U.S. 961, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980); *see Dondi Properties Corp. v. Commerce Savings and Loan Ass'n,* 121 F.R.D. at 288. Although Federal Rule of Civil Procedure 11 is the most common method used for disciplining attorney behavior in the federal courts, that rule is a redundant supplement to other methods at the Court's disposal, including civil contempt, the Court's inherent power to regulate the administration of justice, and 28 U.S.C. § 1927. *See generally* 5A C. Wright & A. Miller, *Federal Practice and Procedure: Civil 2d* § 1332, at 38–39 (1990) (stating that "[e]ven if one assumes that [Rule 11] largely is redundant of other authority its appearance in the Federal Rules apparently has served the need to legitimize the need to employ sanctions, since it has been resorted to so frequently"). Indeed, the authority of the Court to discipline attorneys is embodied in its Local Rules.

---

**8.** The problem of conflicting duties has arisen several times in this lawsuit. For example, in a recent response to a motion by Plaintiffs to compel discovery, Defendants argued that

> to respond to Plaintiffs' requests, case managers, regional monitors, QMRP's, psychologists, psychiatrists, nurses, doctors and many other kind[s] of staff are not performing their own jobs in order to produce responses to Plaintiffs' requests ...
>
> ... The only intention that could be successfully fulfilled by getting the information requested would be harassment and distraction of Defendants not only from preparing for the hearing, but from the provision of services and preparation for the next round of ACDD surveys.

Defendants' Response to Plaintiffs' Motion to Compel Discovery, filed March 25, 1991. Of course, Defendants' argument against Plaintiffs was premised entirely on Defendants' duty to provide care and treatment for Plaintiffs.

Any member of the bar of this Court ... who proves to be incompetent to practice before this Court because of unethical behavior, consistent disregard of these local rules or the Federal procedural rules, or sheer inability to conduct litigation properly, is subject to revocation of admission to practice in this District and to other appropriate discipline, after such hearing as the Court may direct in each particular instance.

Local Rule 13.2.

In *Dondi* this Court, sitting en banc, adopted standards of litigation conduct for attorneys appearing in civil actions in the Northern District of Texas. Although the *Dondi* opinion established no new powers for the regulation of attorney conduct by the Court, it did serve notice on all attorneys appearing in the Northern District of Texas that the Court would actively police their behavior. The Court examined at length the basis for its authority to regulate attorney conduct. *See Dondi Properties Corp. v. Commerce Savings and Loan Ass'n*, 121 F.R.D. at 286–87. The Court found that, pursuant to the Federal Rules of Civil Procedure promulgated by the United States Supreme Court,

[w]e are authorized to protect attorneys and litigants from practices that may increase their expenses and burdens (Rules 26(b)(1) and 26(c)) or may cause them annoyance, embarrassment, or oppression (Rule 26(c)), and to impose sanctions upon parties or attorneys who violate the rules and orders of the court (Rules 16(f) and 37).... We are also granted the authority to punish, as contempt of court, the misbehavior of court officers. 18 U.S.C. § 401. In addition to the authority granted us by statute or by rule, we possess the inherent power to regulate the administration of justice.

*Id.* at 287, *citing Thomas v. Capital Security Services, Inc.*, 836 F.2d 866, 875 (5th Cir.1988) (en banc); *Batson v. Neal Spelce Associates, Inc.*, 805 F.2d 546, 550 (5th Cir.1986). In addition, of course, Federal Rule of Civil Procedure 11 states that "[i]f a pleading, motion, or other paper is signed in violation of this rule, the court ... shall impose ... an appropriate sanction...."

After reviewing the basis of its authority to adopt standards for attorney conduct, the *Dondi* Court set out the standards to which we expect litigation counsel to adhere in civil actions in this district. The Court explicitly adopted standards from the Dallas Bar Association Guidelines of Professional Courtesy, and commended to counsel pertinent parts of the American College of Trial Lawyers' Code of Trial Conduct and the Codes of Professional Responsibility of the American Bar Association and the State Bar of Texas. *See id.* at 287–88, 287 n. 8, 292–96. The following passages are representative of the standards for attorney conduct adopted by the Court:

In fulfilling his or her primary duty to the client, a lawyer must be ever conscious of the broader duty to the judicial system that serves both attorney and client.

A lawyer owes, to the judiciary, candor, diligence and utmost respect.

A lawyer owes, to opposing counsel, a duty of courtesy and cooperation, the observance of which is necessary for the efficient administration of our system of justice and the respect of the public it serves.

Effective advocacy does not require antagonistic or obnoxious behavior and members of the bar will adhere to the higher standard of conduct which judges, lawyers, clients, and the public may rightfully expect.

*Id.* at 287–88 (quoting and adopting Dallas Bar Association Guidelines of Professional Courtesy).

[W]e do not imply by prescribing these standards that counsel are excused from conducting themselves in any manner otherwise required by law or by court rule. We think the standards we now adopt are a necessary corollary to existing law, and are appropriately established to signal our strong disapproval of practices that have no place in our system of justice and to emphasize that a lawyer's conduct, both with respect to the court and to other lawyers, should at

all times be characterized by honesty and fair play.

*Id.* at 288–89. The *Dondi* Court also stated that "[m]alfeasant counsel can expect ... that their conduct will prompt an appropriate response from the Court...." *Id.* at 288.

■ The Court finds that Defendants' counsel repeatedly has violated the standards of attorney conduct adopted in *Dondi* and has violated Federal Rule of Civil Procedure 11. The Court finds that the Assistant Attorney General maintained a pattern of combative and improper conduct even after repeated and strident warnings from the Court. The Assistant Attorney General's conduct has prejudiced the rights of her adversaries and impaired the administration of justice in this case. Furthermore, when an attorney's conduct diverts the Court's attention from the merits of a motion to the circumstances of its filing, her clients' interests are disserved. Also, as the above recitation indicates, the Assistant AG's improper conduct has been so frequent and disruptive that the Court's focus on this case has meant that other deserving cases have gone unattended. In short, Plaintiffs, Advocacy, Defendants, and the administration of justice have all been harmed by the Assistant Attorney General's conduct. The Court has an obligation to impose a serious sanction upon the Assistant AG.

■ The Court finds that a monetary penalty beyond reasonable attorneys' fees Plaintiffs and Advocacy have incurred in pressing their motions for sanctions would not advance the purpose of *Dondi.* To begin with, the Court does not believe that a monetary sanction is appropriate in this case. There is no reason to fine the Attorney General of Texas because of the misguided actions of one assistant. Also, the problem in this case is not one that a fine can fix: there is no reason to believe the Assistant AG's conduct would improve after the taxpayers of Texas pay a fine for the Attorney General, particularly in light of her testimony that all of her actions in this case were taken in subjective good faith.

■ A fine imposed upon the Assistant AG personally might attract her attention, but the Court does not wish to deter potential public servants from pursuing careers with the Attorney General's Office by imposing a fine on the Assistant AG. Likewise, the Court does not wish to chill properly vigorous advocacy by other members of the Attorney General's staff working on this case. In any event, as already mentioned, the Court finds that a monetary sanction is not appropriate in this case.

■ There is no sense in fining TDMHMR; not only is there no evidence that TDMHMR officials participated in the Assistant AG's improper litigation tactics, but a fine would reduce TDMHMR's ability to provide decent services to Plaintiffs. The Court expects Defendants' counsel to investigate Plaintiffs' allegations of illegal conduct by TDMHMR employees during discovery in this case prior to the compliance hearing. The Assistant Attorney General's counsel's suggestion at the prehearing conference on May 10 that such an investigation would be conducted only upon motion by Plaintiffs was appalling.

■ Plaintiffs' request that the Court disqualify two of the lawyers working under the supervision of the Assistant Attorney General, as well as any paralegals working with them, from further participation in this case is expressly rejected as excessively severe and unwarranted by the facts.

■ The Court does believe, however, that it is imperative to punish the Assistant AG and to deter further improper conduct by counsel in this case. Therefore, the Court rules that the Assistant Attorney General shall be REMOVED from further participation in this litigation following the completion of discovery for the upcoming hearing on Defendants' compliance with the Implementation Agreement.

■ There is no question that the Court possesses the authority to remove an attorney from a case pursuant to its inherent power to regulate the conduct of attorneys practicing before it. *See Nissho–Iwai Co.*

*v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 625 (5th Cir.1988) (reviewing disqualification of counsel for directly contacting employees of a corporate party); *Thomas v. Capital Security Services, Inc.*, 836 F.2d at 876–78 (finding in the Rule 11 context that sanctions are mandatory, and that the district court should choose sanctions "that foster the appropriate purpose of the rule, depending upon the parties, the violation, and the nature of the case"); *United States v. Snyder*, 707 F.2d 139, 145 (5th Cir.1983) (establishing standard of review of disqualification orders in criminal cases); *United States v. Salinas*, 618 F.2d 1092, 1093 (5th Cir.) (affirming trial court's disqualification of attorney), *cert. denied*, 449 U.S. 961, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980); *Woods v. Covington County Bank*, 537 F.2d at 819 (citing authority from the Second, Third, Fifth, Ninth, and Tenth Circuits in stating that disqualification orders issued pursuant to a court's supervisory authority are within the discretion of the trial court); *In re Gopman*, 531 F.2d 262, 266–68 (5th Cir.1976) (affirming disqualification order as within "the trial court's power to regulate the conduct of attorneys practicing before it"); *Dondi Properties Corp. v. Commerce Savings and Loan Ass'n*, 121 F.R.D. at 290 (quoting *Ceramco, Inc. v. Lee Pharmaceuticals*, 510 F.2d 268, 271 (2d Cir.1975), in holding that courts have a duty and responsibility to disqualify counsel for unethical conduct prejudicial to their adversaries); Local Rule 13.2 (providing for revocation of admission to practice in this District and "other appropriate discipline" upon a showing of "consistent disregard of these local rules or the Federal procedural rules, or sheer inability to conduct litigation properly"). Indeed, in *Kendrick v. Zanides*, 609 F.Supp. 1162 (N.D.Cal.1985), the court not only ordered the plaintiff and his attorney to pay the defendant's legal fees and expenses pursuant to Rule 11, but also invoked the court's power to suspend the plaintiff's attorneys from practice. *See id.* at 1173 ("Attorneys also have obligations as officers of the court. On the face of it, the conduct of

plaintiff's counsel ... raise[s] questions about their fitness to practice in the federal district court."); *see also In re Ruffalo*, 390 U.S. 544, 545, 552, 88 S.Ct. 1222, 1223, 1226, 20 L.Ed.2d 117 (1968) (reversing Sixth Circuit Court of Appeals' order disbarring attorney from practice in that court because of absence of notice as to the reach of grievance procedure).

■ In the present case, the Court finds that the interests of all of the parties, as well as the administration of justice, require that the Assistant Attorney General be removed from this case. This sanction is the least severe sanction that is appropriate in this case, *see Boazman v. Economics Laboratory, Inc.*, 537 F.2d 210, 212–13 (5th Cir.1976), particularly in light of the futility of a monetary sanction and the Assistant AG's disregard of the Court's repeated warnings over the course of several months.[9]

■ The Court is aware that under Texas law the Attorney General "enjoys an exclusive right to represent state agencies, and if the services of other lawyers are to be had it must be with his permission and 'in subordination' to his authority." *United States v. Texas*, 680 F.2d 356, 368 n. 16 (5th Cir.1982), *citing Hill v. Texas Water Quality Board*, 568 S.W.2d 738, 741 (Tex. Civ.App.—Austin 1978, writ ref'd n.r.e.); *see* Tex.Gov't Code Ann. § 402.021 (Vernon 1990). The Court stresses that its sanction of the Assistant AG is not intended to and does not interfere with the statutory right of the Attorney General of Texas to represent the Texas Department of Mental Health and Mental Retardation. The Court's sanction is directed solely at the Assistant Attorney General presently assigned as lead counsel for Defendants.

The Court will not prejudice the rights of Defendants by sanctioning their attorney. There is no evidence that any TDMHMR official participated in the litigation tactics that the Court today sanctions. Also, it is clear that because of her long involvement with this case, the Assistant AG cannot be

**9.** The Court expressly finds that suspending the Assistant Attorney General from appearing in

the Northern District of Texas would be too severe a sanction.

replaced in the short time remaining before the May 28 hearing. Accordingly, in order to allow the Attorney General of Texas time to assign a new lead attorney and for that attorney to develop a meaningful grasp of this case, the hearing now scheduled for May 28 is VACATED.

### III. Conclusion.

For the reasons stated above, the Assistant Attorney General is REMOVED from further participation in this case as of the date discovery in preparation for the July 22 hearing is completed. Plaintiffs' and Advocacy's motion for reasonable attorneys' fees incurred in connection with their motions for sanctions is GRANTED; Plaintiffs and Advocacy shall submit a affidavit in support of their fee request within one week of entry of this Order. The hearing presently set for May 28, 1991 is rescheduled for *9:00 A.M., July 22, 1991.* Any enlargement of current pretrial deadlines will be set by separate order.

SO ORDERED.