**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

_____

No. 91-3781
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

MIGUEL VAQUERO, a/k/a Michael or Mike Vacuero
or Vaccaro, CLARENCE TAYLOR, JR, and HERMAN J. MOUTON, JR.,

Defendants-Appellants.


_____

No. 91-3805
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

CLARENCE TAYLOR, JR.

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Louisiana

_____
(July 26, 1993)
Before CHIEF JUDGE POLITZ, KING and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge.

BACKGROUND

In 1991, Clarence Taylor, Miguel Vaquero, and Herman Mouton were indicted and convicted for conspiring to possess cocaine with intent to distribute and conspiring to distribute cocaine in

violation of 21 U.S.C. § 846 and 18 U.S.C. § 2. Herman Mouton was also indicted and convicted for unlawfully using a communications facility in violation of 21 U.S.C. § 843(b).

The cocaine conspiracy revolved around Linda Howard, a Baton Rouge drug dealer who, unbeknownst to Appellants, was cooperating with law enforcement officials. Howard bought cocaine from Appellant Vaquero's business partner and friend, Jesus Blanco, who resided in Florida. In turn, Appellants Mouton and Taylor purchased cocaine from Howard, to resell it elsewhere in Louisiana.

Much of the evidence consisted of videotapes and recorded telephone conversations gathered by law enforcement officials using hidden cameras and recording devices in Howard's home and telephone. Taylor, Vaquero, and Mouton each appeal. We affirm.

DISCUSSION

I. Clarence Taylor

A. Sufficient Evidence

Taylor moved for a judgment of acquittal at the close of the Government's case, but not at the close of his case. We therefore restrict our review of his claim to whether his conviction results in a manifest miscarriage of justice. United States v. Knezek, 964 F.2d 394, 399-400 (5th Cir. 1992). A miscarriage of justice exists if the record is devoid of evidence pointing to guilt or if the evidence on a key element of the offense is so tenuous that a conviction would be shocking. United States v. Pierre, 958 F.2d 1304, 1310 (5th Cir. 1992).

2

The indictment charged Taylor with conspiring to possess and distribute cocaine from November 1990 until January 1991. He argues that insufficient evidence exists of his involvement in the conspiracy during this time frame because of Howard's testimony that she personally did not give or sell cocaine to Taylor in November, December, or January and Jeffrey Hale's testimony that he did not know whether he met with Taylor to deal cocaine during November, December, or January.

We note that Taylor need not have purchased cocaine directly from Howard or Hale in order to be involved in the conspiracy. Only slight evidence is needed to connect an individual to an illegal conspiracy once the United States has produced evidence of that conspiracy. United States v. Duncan, 919 F.2d 981, 991 (5th Cir. 1990), cert. denied, 111 S.Ct. 2036 (1991). A defendant is presumed to continue involvement in a conspiracy unless that defendant makes a substantial affirmative showing of withdrawal, abandonment, or defeat of the conspiratorial purpose. United States v. Branch, 850 F.2d 1080 (5th Cir. 1988), cert. denied, 488 U.S. 1018 (1989). The defendant has the burden of going forward with such evidence. United States v. MMR Corp. (LA), 907 F.2d 489, 499-500 (5th Cir. 1990), cert. denied, 111 S.Ct. 1388 (1990). The record reveals substantial evidence that Taylor was deeply involved in the conspiracy prior to November 1990.[1]

---

[1] The following excerpts of Howard's testimony support this finding.
    Q. After you met Clarence Taylor what kind of discussions

3

To prove his withdrawal from the conspiracy, Taylor must

show "[a]ffirmative acts inconsistent with the object of the

_____

did you have with him?
    A.   I told him I could obtain the cocaine that he was
looking for at a reasonable price. . . .
    Q.   Who was present when these kilos [of cocaine] were
tested for quality?
    A.   Clarence and another individual that I know as Bruce.
. . .
    Q.   Now, when was the last time both you and Clarence Taylor
went to Florida?
    A.   It was sometime around the first of February of 1990.
. . .
    Q.   Now, that last instance you discussed, the last time you
went with Clarence Taylor to Florida, would that have been around
February of 1990?
    A.   Yes, sir.
    Q.   And how much cocaine were both of you intending to
obtain in Florida?
    A.   He was buying eighteen kilos and I was buying one.  So
that made it a total of nineteen kilos. . . .
    Q.   Following this last trip that you made to Florida did
you cut your ties with Jesus Blanco?
    A.   No, sir.
    Q.   Now, following this last trip that you made to Florida
did Jesus blanco start to make deliveries into Baton Rouge?
    A.   Yes, sir.
    Q.   How were these deliveries made into Baton Rouge by Jesus
Blanco?
    A.   By automobile.
    Q.   How would you negotiate a purchase for delivery with
Jesus Blanco prior to the actual receipt, or the actual receipt
of the cocaine?
    A.   I would call him and tell him that I needed something,
or he would call me and tell me that he had something and he was
bringing it in.
    Q.   Whenever you said you needed something did you have an
idea as to who your customers were at the time?
    A.   Yes, sir.
    Q.   And how much they were purchasing?
    A.   Yes, sir.
    Q.   And was Clarence Taylor one of your customers?
    A.   Yes. . . .
    Q.   What happened to those four kilos of cocaine?
    A.   I sold them eventually.
    Q.   How did you sell them?
    A.   I sold them two at a time.
    Q.   To whom?
    A.   Clarence Taylor.  Well, I gave them to Van for Clarence.

4

conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." United States v. United States Gypsum Co., 438 U.S. 422, 464-465 (1978). Howard and Hale's testimony that they did not directly sell cocaine to Taylor from November 1990 to January 1991 does not carry this burden. Taylor did not demonstrate his withdrawal from the conspiracy and we therefore conclude that his conviction did not result in a manifest miscarriage of justice.

B.  Prior Acts

A detective with the Osceola County Sheriff's office in Florida testified that in February of 1990 he stopped Taylor's vehicle in Florida and searched it with Taylor's consent and found over $350,000 in Taylor's car. A deputy with the Chambers County Sheriff's office in Texas testified that in May of 1990 he stopped Taylor and his father outside of Beaumont, Texas and found approximately $26,000 as well as a pound and a quarter of cocaine in the vehicle. The court admitted this evidence pursuant to Rule 404(b) to prove motive, opportunity, intent, or preparation. Taylor contends this was error because the evidence was more prejudicial than probative in violation of Rule 403.

Our thorough review of the record reveals that Taylor did not make a Rule 403 objection to the evidence. We are therefore limited to the plain error standard of review. United States v. Blankenship, 746 F.2d 233, 238 (5th Cir. 1984); see United States v. Arteaga-Limones, 529 F.2d 1183, 1198-99 (5th Cir. 1976), cert. denied, 429 U.S. 920 (1976).

5

Taylor's cocaine conspiracy transferred cocaine between Louisiana and Florida by car and airplane, and the amounts of money involved reached the tens if not hundreds of thousands of dollars. The money and cocaine found during Taylor's prior stops and searches in Florida and Texas strongly indicate motive and intent to carry drugs and money interstate. We therefore conclude that the court did not clearly err in admitting the evidence. The evidence was not more prejudicial than probative.

C. Sentencing

Taylor argues that the court erred by (1) increasing his offense level under United States Sentencing Commission, Guidelines Manual, § 3B1.1(c) (Nov. 1990), for his role as a "leader," (2) increasing his offense level under U.S.S.G. § 2D1.1(b)(1) for possessing a weapon during the commission of a drug offense, and (3) increasing his offense level for obstruction of justice based on perjury, under U.S.S.G. § 3C1.1.

1. Taylor's Role as a Leader

Section 3B1.1(c) requires a two level increase in a defendant's offense level if the defendant was an organizer, leader, manager, or supervisor in the criminal activity. Taylor's level was increased because the presentence report identified him as a leader in drug trafficking activities because he independently determined whether to purchase cocaine from the co-conspirators, made decisions about it's quantity, price, and place of delivery, and directed others to transport it.

Taylor argues that this enhancement was error because this

6

information is based on unsubstantiated claims against him, and because the conduct portraying him as a leader did not occur during the time frame of the conspiracy.

Information with a "sufficient indicia of reliability to support its probable accuracy," may be relied upon. See United States v. Alfaro, 919 F.2d 962, 966 (5th Cir. 1990) (quoting U.S.S.G. § 6A1.3(a)). An addendum to the presentence report states that the information is based on statements from confidential informants and cooperating defendants. Having reviewed the presentence report and the sentencing hearing, we find that this information had a sufficient indicia of reliability to support the district court's finding that Taylor had a leadership role in the conspiracy. See United States v. Ramirez, 963 F.2d 693, 708 (5th Cir. 1992), cert. denied, 113 S.Ct. 388 (1992).

Regarding Taylor's claim that the "leadership conduct" occurred prior to November 1990, we first note that § 1B1.3 provides that offense level adjustments shall be determined on the basis of all acts committed by the defendant "that occurred during the commission of the offense of conviction [or] in preparation for that offense." Additionally, the introductory commentary to § 3B1.1 states that the determination of a defendant's role in the offense "is to be made on the basis of all conduct within the scope of § 1B1.3 . . . and not solely on the basis of elements and acts cited in the count of conviction." The court heard testimony specifically identifying Taylor's role

7

as a leader and supervisor in the overall cocaine conspiracy. Given this evidence, we find that the court did not clearly err in enhancing Taylor's offense level for his role as a leader.

2.    Possession of a Weapon

We review a court's decision to apply U.S.S.G. § 2D1.1(b)(1) for clear error.  United States v. Paulk, 917 F.2d 879, 882 (5th Cir. 1990).  Taylor's offense level was increased by two because (1) a .357 revolver was found under the driver's seat of his vehicle one week after his arrest, and (2) a handgun was found in the glove compartment of his rental car when he was stopped in Florida in February 1990.  Taylor objected to this increase, arguing that the gun found in the truck after his arrest was not his and had not been placed there by him, and that the gun in his car in Florida belonged to his passenger.

After Taylor's arrest, police officers inventoried his truck and had it towed to an impoundment lot by a wrecker service that has a contract with the Baton Rouge Sheriff's Department.  One week later, the owner of the impoundment lot noticed that the driver's side door of Taylor's truck was not completely closed. He approached the truck to close the door, saw the handle of a revolver protruding from under the front of the driver's seat, and called the Sheriff's Department.  The Sheriff's Department searched the truck and found cocaine, in addition to the revolver.  Taylor argues that the gun and cocaine were not his, and that he did not place them in the truck.  He suggests that both were planted in the truck sometime after the initial

8

inventory search.  The record does not support Taylor's

position.[2]  The court reasonably adjusted his offense level based

on this evidence.

Regarding the gun found in Florida, the presentence report

states that there is no indication in the police officer's report

that the gun belonged to Taylor's passenger.  The district court

considered this evidence during sentencing, and concluded that

"[t]here is no question that the earlier evidence in the court

indicated that Mr. Taylor knew there was a gun in the car [in

Florida], and in fact told the officer there was a handgun in the

glove box."  Furthermore, an offense level adjustment under §

2D1.1(B)(1) is not limited to situations where the defendant

_____

[2]The owner of the wrecking service that towed Taylor's truck and
owns the impoundment lot where the truck was kept testified that
the truck was towed from the rear, for approximately eight miles,
to the impoundment lot.  The only people who had access to the
truck in the lot were the lot owner and his two employees.  The
employees moved the truck while it was in the lot; they
frequently shifted from forward to reverse, and drove over
gravel.
     The lot is surrounded on all sides by a six-foot fence, is
lit from dusk to dawn with vapor lights, is monitored with
observation cameras at all times, is protected by a two-year old
german shepherd and a billy goat, and the owner lives in his
office, approximately 500 feet from where the truck was kept.  In
twenty-five years of business, the owner has never had an
incidence of theft or vandalism at his lot.
     It is quite plausible that in the course of being towed from
the rear, shifted from forward to reverse and back again, and
being driven over bumpy gravel, the revolver and cocaine could
have been shaken loose from deep beneath the front seat, where
they may have been overlooked during the initial inventory.  In
the course of moving the truck, an employee could easily have
neglected to close the driver's side door completely.
Furthermore, the impoundment lot is secure and well-guarded; it
is unlikely that anyone could plant the evidence in the truck
without being detected by the employees, observation cameras,
german shepherd, or billy goat.

9

possessed a gun during the offense of conviction. <u>U.S. v
Eastland</u>, 989 F.2d 760, 769 (5th Cir. 1993). Taylor's offense
level may be adjusted under § 2D1.1(b)(1) if he possessed a gun
during related relevant conduct. <u>Id</u>. The stop in Florida was
relevant and related to the cocaine conspiracy.

### 3. Obstruction of Justice

Taylor's offense level was increased by two points for
obstruction of justice pursuant to U.S.S.G. §3C1.1 because,
during the motion to suppress hearing, Taylor testified falsely
by denying that he gave the police officer oral permission to
search his car. U.S.S.G. §3C1.1, comment. (n.3(f)).

Taylor objects to this adjustment, arguing that he did not
lie and that in the face of conflicting testimony regarding
whether he gave consent, the Application Notes to § 3C1.1 provide
that the balance should tip in his favor. He also argues that he
was punished for exercising his constitutional right to take the
stand and deny that he consented to the search.

We first note that the district court's imposition of a two
level enhancement for obstruction of justice was not clearly
erroneous, given the presentence report's statement that
information from the police report and officer's testimony
indicates that Taylor consented to the Florida vehicle search.
We next note that although Application Note 2 to § 3C1.1 states
that "suspect statements should be evaluated in a light most
favorable to the defendant," it does <u>not</u> require "the sentencing
judge to believe the defendant. . . . Instead, we believe the

note simply instructs the sentencing judge to resolve in favor of the defendant those conflicts about which the judge, after weighing the evidence, has no firm conviction." U.S. v. Franco-Torres, 869 F.2d 797, 801 (5th Cir. 1989).  The judge in this case was clearly convinced of Taylor's perjury.  Finally, we certainly agree that Taylor has a constitutional right to testify on his own behalf; Taylor does not, however, have a protected right to testify falsely.  United States v. Matos, 907 F.2d 274, 276 (2nd Cir. 1990); United States v. Beaulieu, 900 F.2d 1537, 1539 (10th Cir. 1990), cert. denied, 497 U.S. 1009 (1990). Taylor's constitutional rights were not infringed when the court increased his base offense level based on his perjury.  United States v. Dunnigan, 113 S.Ct. 1111 (1993); United States v. Butler, 988 F.2d 537 (5th Cir. 1993).

II.  Miguel Vaquero

A.  Sufficient Evidence

We will affirm Vaquero's conviction for conspiring to distribute and distributing cocaine if a rational trier of fact could have found guilt beyond a reasonable doubt.  United States v. Leed, 981 F.2d 202, 205 (5th Cir. 1993), cert. denied, 61 U.S.L.W. 3834 (U.S. June 14, 1993) (No.92-8287).  We will reverse only if a reasonable jury would doubt whether the evidence proves an essential element of the offense.

To establish Vaquero's guilt, the government had to prove (1) the existence of an agreement between two or more people to violate the narcotics laws, (2) Vaquero's knowledge and intent to

11

join the conspiracy and (3) Vaquero's voluntary participation in the conspiracy.  United States v. Devine, 934 F.2d 1325, 1346 (5th Cir. 1991), cert. denied, 112 S.Ct. 954 (1992); United States v. Lechuga, 888 F.2d 1472, 1476 (5th Cir. 1989).

Vaquero argues that although a narcotics conspiracy existed, and he knew about it, no rational jury could have found that he intentionally and voluntarily participated in it because, out of numerous video tapes and over 100 recorded telephone conversations gathered by the government, he is implicated in only one video.  In that video he is shown with his business partner Jesus Blanco, at Linda Howard's home, and he agrees to oversee future cocaine deliveries from Florida to Baton Rouge. Vaquero testified that although the video portrays him as dealing cocaine, in reality he was caught in the wrong place at the wrong time, and nervously "played along" in order to protect himself.

Having reviewed the videotape, we find that a rational jury could easily have concluded that Vaquero voluntarily and intentionally participated in the conspiracy.  The tape shows Vaquero, sitting in the midst of a discussion about cocaine dealing, relaxed and enthusiastic, to say the least.  This is not a case of being present in a "climate of activity that reeks of something afoul," as was the case in U.S. v. Maltos, 985 F.2d 743 (5th Cir. 1992) (holding that evidence of a defendant's presence around cocaine dealers is insufficient to sustain a conspiracy conviction).  Rather, Vaquero was photographed agreeing to oversee cocaine transportation.  The jury heard his explanation,

12

and reasonably found it incredible that he was just "playing along."

Vaquero also argues that the most important person the prosecutor could have offered to testify to his intent and voluntary participation in the conspiracy was Jesus Blanco, his friend and business partner. Blanco was also indicted for the conspiracy, but entered into a plea agreement prior to trial. Vaquero contends that the government's failure to call Blanco to testify against him indicates that Blanco's testimony would be adverse to the contention that Vaquero intended to join the conspiracy. This argument is meritless. We refuse to speculate as to the government's motivation in choosing witnesses, or to speculate as to what testimony those witnesses may have provided.

B.      Failure to Instruct the Jury

The government introduced evidence of Taylor's and Mouton's prior acts under Fed.R.Evid. 404(b). Before this evidence was introduced, Vaquero's counsel requested the court to instruct the jury that the evidence was not attributable to Vaquero. The district court refused, stating "[a]t the close of all evidence, if there [are] specific instructions that need to be given regarding the use of certain tapes or certain videos regarding Mr. Vaquero, we can put that in the final charge." Vaquero argues that this refusal constitutes error.

A court's refusal to deliver a requested jury instruction is reversible error only if the instruction: "(1) was substantially correct; (2) was not substantially covered in the charge

13

delivered to the jury; and (3) concerned an important issue so that the failure to give it seriously impaired the defendant's ability to present a given defense." <u>U.S. v. Duncan</u>, 919 F.2d 981, 990 (5th Cir. 1990); <u>United States v. Burroughs</u>, 876 F.2d 366, 369 (5th Cir. 1989; <u>United States v. Mollier</u>, 853 F.2d 1169, 1174 (5th Cir. 1989).

Vaquero has made no showing whatsoever that the refusal to deliver his requested instruction at the time requested constitutes reversible error. Furthermore, Vaquero failed to provide a proposed instruction to the court regarding this issue, and failed to object to the court's closing jury charge, thereby waiving any objection to the closing charge.[3] <u>See</u> <u>United States v. Jacob</u>, 781 F.2d 643 647-648 (8th Cir. 1986).

C.    Prior Act

The court allowed the government to introduce evidence of

---

[3]  The court charged the jury in part:
> During this trial you have heard evidence of acts of the defendants which may be similar to those charged in the indictment but which were committed on other occasions. You must not consider any of this evidence in deciding if the defendants committed the acts charged in the indictment; however, you may consider this evidence for other very limited purposes. If you find beyond a reasonable doubt from other evidence in this case that a defendant did commit the acts charged in the indictment, then you may consider evidence of the similar acts allegedly committed on other occasions to determine, first, whether <u>that defendant</u> had the state of mind or intent necessary to commit the crime charged in the indictment, or two, whether <u>that defendant</u> had a motive or the opportunity to commit the act charged in the indictment, or three, whether <u>that defendant</u> acted according to a plan or in preparation for commission of a crime, or four, whether <u>that defendant</u> committed the act for which he is on trial by accident or mistake. These are the limited purposes for which any evidence of other similar acts may be considered. (emphasis added)

14

Vaquero's prior possession of cocaine in Florida under Rule 404(b), in order to show his motive or intent. Vaquero argues that the evidence is irrelevant under Rule 401, more prejudicial than probative under Rule 403, and does not prove motive or intent as required by Rule 404(b).[4]

We review the admission of evidence under the standards set out in § I.B hereof.

Vaquero argued at trial that although the video tape portrays him as a willing participant in the conspiracy, he never intended to deal cocaine or aid anyone else in doing so; he thereby put his intent at issue. See United States v. Adderly, 529 F.2d 1178, 1181 (5th Cir. 1976). The court did not abuse its discretion in admitting evidence of Vaquero's prior possession of cocaine in Florida because it rebuts Vaquero's contention that he lacked the mens rea to deal drugs. Furthermore, because this evidence was quite probative of Vaquero's intent, the district court did not abuse its discretion in determining that the evidence was more probative than prejudicial.

D.   Sentencing

1.   Obstruction of Justice

Vaquero claimed, under oath, that his involvement in the conspiracy, as depicted in the videotape, was limited to that of an unwilling participant, and for this reason the court added two

---

[4] Under Fed.R.Evid. 404(b), evidence of prior crimes, wrongs, or acts may be admitted to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

points to his base offense level for obstruction of justice in the form of perjury under United States Sentencing Commission, Guidelines Manual, § 3C1.1. (Nov. 1990). Vaquero argues that this adjustment (1) punished him for testifying on his own behalf, in violation of his rights under the Fifth Amendment, (2) constitutes double jeopardy by punishing him both for the crime itself and for his defense to the crime, in violation of the Sixth Amendment, and (3) constitutes cruel and unusual punishment in violation of the Eighth Amendment.

The district court's finding of perjury, based on Vaquero's continued assertion that he never intended to deal drugs, is fairly supported by the record. His Fifth Amendment claim fails because he has no constitutional right to testify falsely. United States v. Matos, 907 F.2d 274, 276 (2nd Cir. 1990); United States v. Beaulieu, 900 F.2d 1537, 1539 (10th Cir. 1990), cert. denied, 497 U.S. 1009 (1990). His Sixth Amendment claim "misperceives the distinction between a sentence and a sentence enhancement." United States v. Ainsworth, 932 F.2d 358, 363 (5th Cir. 1991), cert. denied 112 S.Ct. 346 (1991) (quoting United States v. Mocciola, 891 F.2d 13, 17 (1st Cir. 1989) (holding that a claim for double jeopardy does not arise in the context of a sentence enhancement for possessing a firearm in relation to a drug offense). Finally, his Eighth Amendment claim that his base offense level was upgraded by two points "for simply testifying on [his own] behalf constitutes 'cruel and unusual punishment'" must fail. His offense level was not adjusted because he testified on his own behalf; it

16

was adjusted because he perjured himself. Vaquero's offense level enhancement for perjury did not violate his constitutional rights. United States v. Dunnigan, 113 S.Ct. 1111 (1993); United States v. Butler, 988 F.2d 537 (5th Cir. 1993).

### 2. Minor Participant

Vaquero also argues that the court erred by refusing to adjust his offense downward by two levels under U.S.S.G. § 3B1.2 for his minor role in the conspiracy. He asserts, without support in the record, that the government concedes that he played a minor role.

U.S.S.G. § 3B1.2, comment. (n.1) states that this adjustment is intended to apply to individuals who are "less culpable than most other participants." The district court did not clearly err in determining that Vaquero did not play a minor role in the conspiracy, a finding supported by Vaquero's statement on videotape that he would oversee cocaine shipments from Florida to Baton Rouge every two weeks.

### 3. Amount of Cocaine

Vaquero contends that the court erred by determining that the total amount of cocaine involved in the conspiracy was twenty kilograms, primarily because the jury determined that he had possessed only five kilograms.

Application Note 1 of § 2D1.4 provides "[i]f the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount." Vaquero agreed to transport between fifteen and twenty

17

kilograms of cocaine from Florida to Baton Rouge. Although he never actually transported it, his agreement to do so provides a sufficient basis for the court to calculate his base offense level using the figure of twenty kilograms of cocaine.

III. Herman Mouton, Jr.

A.   Insufficient Evidence

We review a claim of insufficient evidence to determine whether a rational jury could find guilt beyond a reasonable doubt. United States v. Anderson, 987 F.2d 251, 255 (5th Cir. 1993).

To prove a conspiracy, the government must show, inter alia, that an agreement existed between two persons.  Mouton claims that the government failed to prove that an agreement existed, because the only person he "agreed" with was Linda Howard, who cannot be considered a co-conspirator because she was a government informant. United States v. Martino, 648 F.2d 367, 405 (5th Cir. 1981), cert. denied, 456 U.S. 943 (1982).

Having reviewed the record, we find that ample evidence exists of Mouton's agreement with members of the conspiracy other than Howard,[5] and a rational jury could easily have determined that

_____

[5]  For example, Jeffrey Hale gave the following testimony regarding both his involvement and Joe Collier's involvement with Mouton in the conspiracy:

Q:   After you had been [driving Mr. Mouton to Alexandria] for a couple of months, what did Mr. Mouton tell you?
A:   He was telling me basically how I could make some quick money, easy money, by just holding the drugs that he was getting and delivering it to him when he needed it, whenever he needed it delivered to him. . . .
Q:   Did you receive money for sitting on the drugs?
A:   Yes.
Q:   From whom did you receive this money?
A:   Mr. Mouton.

18

Mouton was a member of the conspiracy beyond a reasonable doubt.

B.    Waiver of Conflict-Free Counsel

We review the district court's acceptance of Mouton's waiver of conflict-free counsel for simple error.  See United States v. Snyder, 707 F.2d 139, 144 (5th Cir. 1983) (holding that the standard of review for challenged attorney disqualification orders in criminal cases is simple error).

Under the Sixth Amendment, if a defendant has a constitutional right to counsel, he also has a corresponding right to representation that is free from any conflict of interest.  Wood v. Georgia, 450 U.S. 261, 271 (1981).  "A conflict exists when defense counsel places himself in a position conducive to divided loyalties."  United States v. Carpenter, 769 F.2d 258, 263 (5th Cir. 1985) (citing Mitchell v. Maggio, 679 F.2d 77, 79 (5th Cir. 1982), cert. denied, 459 U.S. 912 (1982)).

Mouton's attorney, Edward Stephens, jointly represented Mouton and Stewart, an alleged co-conspirator not party to this appeal.  Furthermore, Stephens may have been identified in one of the tape-

---

Q:    Did you receive that money directly from Mr. Mouton or from some other individual?
A:    Just from Mr. Mouton. . . .
Q:    Now, you mentioned, I believe, that Joe Collier was a customer of Mr. Mouton?
A:    Yes.
Q:    New, was Mr. Mouton selling to Joe Collier or buying from him or both?
A:    I would deliver it to him, to Joe Collier.  I would give it to him, and him and Mr. Mouton did business after that.  I would just drop it off to him.
Q:    Just so we are clear, what were you delivering to Mr. Collier?
A:    Cocaine.

19

recorded conversations as also being involved in the conspiracy.[6]

Assuming that the taped reference to "Eddie" is Stephens, Stephens may have been reluctant at trial to ask questions of witnesses that could implicate either his client Stewart or himself, a valid conflict of interest existed. The finding of an actual conflict of interest triggers the need for a hearing pursuant to <u>United States v. Garcia</u>, 517 F.2d 272 (5th Cir. 1975). <u>Garcia</u> directs the district court, when a conflict of interest exists between the defendant and his attorney, to:

> Address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest. The defendant must be at liberty to question the district court as to the nature and consequences of his legal representation. Most significantly, the court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections. Cf. <u>United States v. Foster</u>, 469 F.2d 1 (1st Cir. 1972). It is, of course, vital that the waiver be established by "clear, unequivocal, and unambiguous language." <u>National Equipment Rental v. Szukhert</u>, [sic] 375 U.S. 311, 84 S.Ct. 411, 11 L.Ed.2d 354, 367-8 (1964). Mere assent in response to a series of questions from the bench may in some circumstances constitute an adequate waiver, but the court should nonetheless endeavor to have each defendant personally articulate in detail his intent to

---

[6] In that tape-recorded conversation between Howard and a witness, in response to Howard's question "[i]s he the only one that does for you?," the witness replies "[n]o, if I can find my law partner, you know him, Eddie. . . ."

20

> forego this significant constitutional
> protection. . . . We hold only that if, as a
> matter of fact, a defendant after thorough
> consultation with the trial judge knowingly,
> intelligently and voluntarily wishes to waive
> this protection, the Constitution does not
> prevent him from so doing.

Garcia, 517 F.2d at 278.

The court fully complied with Garcia and held a thorough

hearing advising Mouton, himself an attorney, of his right to waive

the conflict, and of the dangers involved in making such a waiver.[7]

---

[7]  The court explained to Mouton:

The United States Constitution gives every defendant the
right to effective assistance of counsel.  When one lawyer
represents two or more defendants in a case, or when we have the
conflict as has been stated here between you and Mr. Stephens
because of evidence that might affect the lawyer, the lawyer may
have trouble representing all of the defendants with the same
fairness.

This is a conflict of interest that denies the defendant the
right to effective assistance of counsel.  Such conflicts are
always a potential problem because different defendants may have
different degrees of involvement.

Each defendant has a right to a lawyer who represents him
and only him.  This kind of conflict of interest can be dangerous
to a defendant in a number of ways.  A few examples are: the
Government may offer to recommend a lesser sentence to one
defendant if he cooperates with the Government.  His lawyer ought
to advise him on whether or not to accept this offer, but if the
lawyer advises him to accept the offer, it may harm the cases of
the other defendants or of the lawyer himself, in this case who
are also his clients.

The Government may let a defendant who is not as involved as
other defendants plead guilty to lesser charges than the other
defendants.  After the guilty plea, however, the Government may
require the defendant to testify.  The lawyer who represents more
than one defendant or who may be concerned about representing
himself might recommend that either the first defendant not plead
guilty to protect the other defendants that he represents or that
the only defendant he is representing not plead guilty in order
to protect the lawyer.

The lawyer might also recommend that the first defendant
plead guilty which might harm the cases of the other defendants.
Sometimes one of the defendants represented by a lawyer will take
the stand to testify in his own behalf.  In order to represent
the other defendants fairly, the lawyer should question the

21

Mouton, as an attorney with twenty years experience, fully understood the district court's concerns over his attorney's conflicts, and indicated more than once that he desired to waive his right to conflict free counsel.

---

defendant on the stand as completely as possible.  However, he may not do so because he cannot ask the defendant as a witness about anything that the defendant has told him in confidence. This would arise, for example, if Mr. Stewart took the stand here or maybe even if you took the stand and you wanted to say something about -- it wasn't you, it was Mr. Stephens, for example.  And that is what that conversation was all about.

The best defense for a single defendant often is the argument that while the other defendants may be guilty, he is not.  A lawyer representing two or more defendants cannot effectively make such an argument.  Evidence that helped one defendant might harm another defendant's case.  When one lawyer represents two or more defendants, he might offer or object to evidence that could help one defendant if it harms the other defendant's case.

The court advises defendants against representation by a lawyer who also represents other defendants in the same case or who might have to represent himself.  The court urges each defendant to obtain a lawyer who will represent him and only him. Each defendant has the right to a lawyer of his own.  Each defendant can also give up that right if he chooses.

The Court:  I have read the above statement to you.  Now, do you understand that?

Mouton:  I do, your Honor.

The Court:  Okay.  Do you understand that you have a right to an attorney of your own?

Mouton:  Yes, I do.

The Court:  You understand that you have a right to a conflict free attorney?

Mouton:  Yes, I do, your Honor.

The Court:  You understand you have a right to a competent attorney?

The Witness:  Yes, I do, your Honor.

The Court:  And you understand, as I understand it, you want Mr. Stephens to represent you as your lawyer even though he previously represented another defendant Mr. Stewart and you heard the evidence regarding the allegations against Mr. Stephens?  Knowing all this, you want him to represent you even though he might have a conflict which might not be in your best interest?

Mouton:  Yes, I do, your Honor.

Mouton now argues that his waiver was not made "knowingly" because the district court would not guarantee him that if he chose new counsel, that counsel would be given adequate time to prepare for the trial which was scheduled in two weeks. We are not persuaded. The court clearly stated to Mouton that his concern over whether a new attorney would have adequate time to prepare for trial should not factor into his waiver decision at all, and that <u>if</u> he decided to retain a new attorney, <u>then</u> the district court would determine whether his new attorney required additional time to prepare for trial. Furthermore, the court noted that Mouton had been aware for sixty days of the potential conflict of interest with his attorney. The court explicitly told Mouton more than once that if he desired a new attorney the court would question that attorney to determine whether he could prepare for trial in two weeks. Mouton had no right to a guaranteed continuance of his trial before deciding whether to retain new counsel.

Our determination that Mouton knowingly, voluntarily, and intentionally waived his right to conflict free counsel does not, however, end our inquiry. An accused's right to waive conflict-free representation is not absolute. If the conflict is so severe as to render a trial inherently unfair, then the integrity of the judicial system has been undermined, and the accused has been deprived of his right to effective assistance of counsel. <u>United States v. Snyder</u>, 707 F.2d 139, 145 (5th Cir. 1983) (citing <u>Uptain v. United States</u>, 692 F.2d 810 (5th Cir. 1982)). We determine whether the integrity of the judicial system has been undermined by

23

reference to the current national standards of legal ethics. See In Re Dresser Industries, Inc., 972 F.2d 540, 544 (5th Cir. 1992). The ABA Model Rules of Professional Conduct provide that an attorney may not represent a client whose interests are adverse to those of another client or the attorney himself unless the attorney reasonably believes that the new client's representation will not be affected, and the client consents after having the conflicts explained to him.[8]  The Disciplinary Rules of the ABA Model Code of Professional Responsibility set forth similar standards.[9]

---

[8]Rule 1.7 provides:
 (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
  (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
  (2) each client consents after consultation.
 (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client . . . unless:
  (1) the lawyer reasonably believes the representation will not be adversely affected; and
  (2) the client consents after consultation. . . .

ABA/BNA Lawyer's Manual of Professional Conduct 51:401-402 (1990 update).

[9]DR 5-101(A) provides:
 (A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial business, property, or personal interests.

DR 5-105(B) and (C) provide:
 (B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted

24

The conflicts between Mouton and his attorney Stephens were based on Stephens's representation of a co-conspirator not party to this appeal, and on one witness's reference to a law partner named Eddie, purportedly Stephens.  In light of current standards of legal ethics, these conflicts do not undermine the integrity of the judicial process in this case.  Stephens demonstrated during the Garcia hearing that he believed his representation of Mouton would not be affected by the cited conflicts.[10]  He unequivocally

_____

under DR 5-105 (C).

    (C)   In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment of behalf of each.

ABA/BNA Lawyer's Manual on Professional Conduct 01:328-329 (1991 update).

[10]Mouton's attorney stated:
    [Mouton and his family] feel comfortable with my office and I feel that we do well for them.
    And just if I could be heard, your honor, as to the potential conflict. . . .  In the case at bar the co-defendant, if any could be suggested, there is no conflict.  I don't represent Mr. Collier or Jesus or those other persons, only Mr. Mouton.
    The discussion as to Leonard Stewart we take the position that it is simply a distraction, your honor, intended to be a distraction, a smoke screen rather and not intended to establish any true conflict.  There is none that exists to my knowledge.
. . . .
    And, your honor, we can't divorce ourselves from Mr. Mouton being a lawyer also.  It is not just a run-of-the-mill or lay defendant.  He is a lawyer who knows exactly what he is faced with much more than a lay person.  And I think that warrants some concern.
. . . .
    At this point, your honor, I have not gathered any information from my prior representation of Mr. Stewart that I -- first of all I have not revealed any and I have not obtained any

25

advocated that he be allowed to continue representation of Mr. Mouton.

Regarding Mouton's consent, Mouton is an attorney who practiced law for twenty years, and even assisted Stephens in the preparation of this case. As such, he fully understood, more than a lay person could, the potential harm that could arise from representation by an attorney with a conflict of interest. Furthermore, the district court went to great lengths during the Garcia hearing to explain how the conflicts may arise, how they may affect Stephens's performance as an advocate for Mouton at trial, and how Mouton could be adversely affected. It is beyond debate that Mouton understood the problem and knowingly took his chances with Stephens. We limit our holding to the facts of this case; when a defendant who is an attorney with twenty years of experience unequivocally waives his right to conflict free counsel, following a full Garcia hearing, and when the potential conflict arises from counsel's dual representation of co-conspirators and counsel's tangential link to the conspiracy himself, the integrity of the judicial system is not undermined and the accused has not been deprived of his right to effective assistance of counsel. Compare United States v. Greig, 967 F.2d 1018 (5th Cir. 1992) (holding that when the court failed to hold a Garcia hearing, an attorney who twice initiated ex parte communications with a defendant other than the defendant that he was representing, and thereby was open to an indictment for obstruction of justice as well as severe

_____

that could be a conflict to Mr. Mouton.

26

disciplinary measures and monetary sanctions, could not continue to represent the defendant); <u>United States v. Snyder</u>, 707 F.2d 139 (5th Cir. 1983) (holding that the likelihood of public suspicion outweighs the social interest served by an attorney's representation of the defendant when the attorney himself had already been indicted for his participation in the defendant's crime).  The district court did not err in accepting Mouton's waiver of conflict-free counsel.

C.    Ineffective Assistance of Counsel

To prevail on his claim of ineffective assistance of counsel, Mouton must meet the well known criteria of <u>Strickland v. Washington</u>, 466 U.S. 668, 690, 696 (1984).

Mouton has identified various acts and omissions by his attorney that he argues fell outside the range of professional judgment.[11]  We need not determine whether these acts fell outside the range of competent assistance before determining whether Mouton was prejudiced by the conduct.[12]  Mouton has made no showing that the outcome of his trial would have been different but for his

---

[11]  Specifically, he cites his attorney's failed promise to develop a "drug addiction" defense, virtual silence during voir dire, inadequate cross-examination of Jeffrey Hale, and inability to support an entrapment defense.

[12]    In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  The object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.
<u>Strickland v. Washington</u>, 466 U.S. 668, 697 (1984).

27

attorney's alleged errors.  Furthermore, our review of the record indicates that the evidence presented against Mouton was overwhelming, and it is highly unlikely that, if his attorney had acted differently, the jury would have reached any decision other than finding Mouton guilty.  He has failed to prove that he was denied his right to effective assistance of counsel.

D.    Sentencing Error

Mouton argues that the court erred in increasing his offense level by two under United States Sentencing Commission, Guidelines Manual, §1B1.3 (Nov. 1990), which provides that adjustments to offense levels shall be made on the basis of all acts caused by the defendant "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." The probation officer adjusted Mouton's base offense level upward based on the government's assertion that 116.5 kilograms should be included within relevant conduct.  Mouton claims that the district court's finding that his conduct involved 116.5 kilograms of cocaine is based on hearsay, thereby violating his rights under the Fifth and Sixth Amendments.

Having reviewed Mouton's sentencing hearing, we find that the court's conclusion that Mouton's conduct involved 116.5 kilograms of cocaine was not based solely on hearsay.[13]  The court did not err

---

[13]  In making this determination, the court "relie[d] not only on the evidence presented today by Mr. Connors [a member of the Sheriff's Department in Baton Rouge], but also relie[d] on the testimony presented at the trial from Mr. Hale and Ms. Howard, as well as the tapes, both audio and video tapes, and other evidence

28

in increasing Mouton's sentence under § 1B1.3.

CONCLUSION

For the foregoing reasons, we AFFIRM the convictions and sentences of Clarence Taylor, Miguel Vaquero, and Herman Mouton, Jr.

------

presented at the trial of this case."